CORRECTED

# In the United States Court of Federal Claims

No. 12-484C

(Filed: June 27, 2019)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| **FASTSHIP, LLC**, | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| **UNITED STATES**, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

Patent case; motion for award of attorneys'
fees and expenses pursuant to 28 U.S.C. §
1498(a); prevailing plaintiffs; jurisdiction;
standing; real party in interest; litigation-
financing agreement; patent owners' fee
agreements with counsel; findings regarding
justification for the government's position;
reasonable attorneys' fees, expenses of expert
witnesses, and costs

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Mark L. Hogge, Dentons US LLP, Washington, D.C., for plaintiff.  With him on the briefs and at trial were Rajesh C. Noronha, Dentons US LLP, Washington, D.C., and Donald E. Stout, Fitch, Even, Tabin & Flannery LLP, Washington, D.C.

Scott Bolden, Deputy Director, Intellectual Property Staff, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  With him on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, and Gary L. Hausken, Director, Intellectual Property Staff, Civil Division, United States Department of Justice, Washington, D.C.  Of Counsel was Andrew P. Zager, Department of the Navy, Washington, D.C.

## OPINION AND ORDER

LETTOW, Senior Judge.

In 2012, Plaintiff FastShip, LLC ("FastShip") initiated litigation against the United States (the "government") for patent infringement by a class of littoral combats ships ("LCS").[1]  After a trial, FastShip prevailed on the merits of its infringement claim respecting the first of these ships, LCS-1, *USS Freedom*, receiving an award of $6,449,585.82 as of September 6, 2006, plus interest from that date.  *See FastShip, LLC v. United States*, 131 Fed. Cl. 592, 627-28 (2017) ("*FastShip III*").  The judgment was affirmed on appeal, with the amount of damages adjusted to correct a transcription error, resulting in an award for infringement of $7,117,271.82, plus interest for delay damages.  *FastShip, LLC v. United States*, 892 F.3d 1298, 1310 (Fed. Cir. 2018) ("*FastShip IV*").  FastShip ultimately recovered $12.36 million for the infringement, including delay damages.  *See* Pl. FastShip, LLC's Reply in Supp. of its Mot. for Attys' Fees &

---

[1]Littoral combat ships are highly maneuverable vessels designed for operations both in ocean waters and near shore and are comparable in size to corvettes found in various navies.

Related Expenses ("Pl.'s Reply") at 25, ECF No. 212. FastShip now moves for an award of attorneys' fees and related expenses pursuant to 28 U.S.C. § 1498(a) and submits a bill of costs pursuant to Rule 54(d) of the Rules of the Court of Federal Claims ("RCFC").

The government opposes an award of attorneys' fees and expenses. First, the government argues that due to a litigation financing agreement, FastShip is not a real party in interest and therefore lacks standing to bring the claim for attorneys' fees and costs. Second, the government contends that its position during the litigation was reasonable and substantially justified, precluding an award of attorneys' fees and costs under 28 U.S.C. § 1498(a). Third, the government argues that even if FastShip is entitled to an award of attorneys' fees and costs, the award requested is unreasonable and must be reduced. The court concludes that FastShip is and has been the real party at interest in this litigation, and thus it has standing to bring a claim for attorneys' fees and costs. The court also finds that the government's position during the litigation was not substantially justified. Finally, the court concludes that FastShip's request is generally reasonable but must be reduced to eliminate certain inappropriate and unallowable costs and excessive attorneys' fees. Accordingly, FastShip's request for expenses and attorneys' fees is granted in part and denied in part.

## BACKGROUND

### A. *Infringement of FastShip's Patent, Trial, and Appeal*

FastShip is the assignee of two patents, United States Patent Nos. 5,080,032 ("the '032 patent") and 5,231,946 ("the '946 patent"). *FastShip III*, 131 Fed. Cl. at 598. These two patents were originally filed by the inventor, David Giles, and are directed to and describe "a monohull fast sealift [] or semi-planing monohull [] ship . . . whose hull design in combination with a waterjet propulsion system permits, for ships of about 25,000 to 30,000 tons displacement . . . [travel at] speeds of up to 40 to 50 knots in high or adverse sea states." *Id.* at 598-99 (quoting the '032 patent, col. 1, lines 6-13; '946 patent, col.1, lines 10-17). Put differently, the patents are for ship designs that allow a large ship to travel at high speeds, despite difficult weather and sea conditions. After being originally filed in the United Kingdom, the '032 patent was issued by the United States Patent Office on January 14, 1992, and the '946 patent was issued on August 3, 1993. *Id.* at 599.

The conduct by the government that gave rise to this litigation started some years later. In the early 2000s the Navy began "exploring the concept that later became the LCS program . . . [,] seeking new ships that could be used for 'focused missions' at high speeds." *FastShip III*, 131 Fed. Cl. at 600 (internal citation omitted). After an initial study that laid out program performance parameters, the Navy issued a request for proposals for the LCS program in 2003. *Id.* The Navy's request did not specify a required hull design. *Id.*

During the initial phase of the LCS procurement, FastShip met with two government contractors, Lockheed Martin and Gibbs & Cox, to "discuss FastShip's potential contributions to the team." *FastShip III*, 131 Fed. Cl. at 601. Representatives for Lockheed Martin and Gibbs & Cox told FastShip it was "unlikely" for the parties to engage in a direct arrangement for hull design, but that it was possible to add FastShip "to the team for 'certain design aspects.'" *Id.* (citation omitted). About a month later, FastShip and the two government contractors "signed a

term sheet related to FastShip's potential participation on the LCS team" that provided for "information sharing between the LCS team and FastShip, subject to [] non-disclosure and confidentiality agreements." *Id.* at 601-02.  Despite this agreement, FastShip was sidelined as the design for the ship evolved through the procurement process and construction proceeded, with the first ship, the LCS-1, being launched on September 23, 2006. *Id.* at 603.  The completed LCS-1 featured a semi-planing monohull. *Id.* at 602-03.

FastShip filed an administrative claim with the Navy in 2008, contending that the LCS program infringed upon their patents and demanding compensation. *FastShip LLC v. United States*, 122 Fed. Cl. 71, 77 (2015) ("*FastShip II*").  The Navy replied two years later, stating it had investigated the claim and believed the LCS program did not infringe FastShip's patent. *Id.* The government denied any compensation. *Id.*  After receiving the Navy's response, FastShip sent another letter "reiterat[ing] the 'allegations of patent infringement,'" before filing its complaint with this court on August 1, 2012. *Id.*

The parties submitted briefs on claim construction of the patents at issue in August and September of 2013 and held a technical primer for the court on August 27, 2013. *FastShip, LLC v. United States*, 114 Fed. Cl. 499, 503-04 (2013) ("*FastShip I*").  The court then held a *Markman* hearing on September 13, 2013 before issuing an opinion construing eight of the claim terms on October 9, 2013. *Id.* at 504.  The case thereafter proceeded with discovery until the government moved for summary judgment respecting LCS-3 and subsequent *Freedom* class ships. *FastShip II*, 122 Fed. Cl. at 77.[2]

The court granted the government's motion with regard to LCS-3 and the subsequent ships in the *Freedom* class, finding that these ships "were not 'manufactured' by or for the government within the meaning of 28 U.S.C. § 1498 prior to the expiration of the patents in suit." *FastShip II*, 122 Fed. Cl. at 72, 86.  This decision left only LCS-1 as the basis for FastShip's infringement claim. *FastShip III*, 131 Fed. Cl. at 607.

The court conducted a site visit at the constructing shipyard, visited the Carderock Naval Test Basin, and then held a ten-day trial from October 3, 2016 to October 17, 2016. *FastShip III*, 131 Fed. Cl. at 607.  After post-trial briefing and closing argument, the court issued its decision on April 28, 2017. *See generally id.* at 592.  The court found that the claims from the '032 and '946 patents were valid and directly infringed by the government in its construction of the LCS-1. *Id.* at 618.  It awarded FastShip $6,449,585.82 in damages as of September 23, 2006, the launch date of LCS-1. *Id.* at 627.  The court also held that FastShip was entitled to interest for the delayed compensation from the launch date and could apply for "reasonable costs and reasonable fees for witnesses and attorneys under 28 U.S.C. § 1498(a) . . . within 30 days after any appellate process has been concluded." *Id.* at 627-28.

An appeal followed. *See Fastship IV*, 892 F.3d 1298.  In its decision, the Federal Circuit affirmed the decision of this court to find infringement by the LCS-1, affirmed a grant of summary judgment that LCS-3 was not "manufactured" within the meaning of 28 U.S.C. §

_____

[2] The *Freedom* class of LCS are designated as LCS-1, 3, 5, 7, 9, 11, *et al.*, taking into account the design and construction of a second class of littoral combat ships, the *Independence* class, designated as LCS-2, 4, 6, *et al.*

1498(a) before the expiration of the patents-in-suit, and modified the damage amount due to a transcription error. *See id.* at 1310. The Federal Circuit also held that "[e]ach party shall bear its own costs" for the appeal. *Id.* at 1311.

### B. Costs and Fees Requested Pursuant to 28 U.S.C. § 1498(a)

After prevailing on the appeal, FastShip filed a motion for attorneys' fees and related expenses ("Pl.'s Mot."), ECF No. 190, and a bill of costs ("Pl.'s Bill of Costs"), ECF No. 191, on October 4, 2018. Both the motion for attorneys' fees and related expenses and the bill of costs have 30 attachments, 29 of which are identical. *Compare* Pl.'s Mot. *with* Pl.'s Bill of Costs. The first, and only different, attachments are memoranda in support of FastShip's motion for attorneys' fees and related expenses, ECF No. 190-1 ("Pl.'s Br."), and bill of costs, ECF No. 191-1 ("Pl.'s Cost Br."). The second attachment, identical in both motions, is a declaration by Rajesh C. Noronha, ECF Nos. 190-2, 191-2 ("Noronha Decl."), a "Senior Managing Associate" at Dentons and one of the counsels for FastShip. Mr. Noronha's declaration also provides an index to the remaining 28 attachments, which are identified as exhibits and support FastShip's motion for attorneys' fees and related expenses and bill of costs. *Id.*[3]

Exhibit 1 in both motions, but apparently only relevant to the motion for attorneys' fees and related expenses, is a declaration by FastShip's counsel of record, Mr. Mark L. Hogge, attesting to the reasonableness and accuracy of the request. PX 1. In his declaration, Mr. Hogge states that he provided "the manager of FastShip, LLC, with an invoice for our legal services usually on a monthly basis, setting forth the time devoted to the representation, and the billing rates charged by each timekeeper and maintained a running total of fees incurred." PX 1 at 2-3. Exhibit 1 also contains sub-exhibits. Sub-exhibit 1-A is a copy of the engagement agreement between Dentons and FastShip. *Id.* at 2. Sub-exhibit 1-B is a lengthy example of the extensive document production that characterized this litigation. *Id.* at 3. Sub-exhibit 1-C is a worksheet listing the time entries and detailing the work done on the litigation from July 22, 2012 to September 30, 2018, totaling $6,988,906.80. *Id.* These entries do not separately state the hourly rate charged, nor do they provide an overall summary of the hours charged, either in total or by the individual attorney. *See id.* Mr. Hogge states that he "reviewed and edited" the time entries. *Id.* Finally, Sub-exhibit 1-D separately lists the fees incurred for the summary judgment motion on the LCS-3 and the later *Freedom* class ships, totaling $498,809.70. *Id.*

Exhibits 2 through 11 provide declarations by counsel of record attesting to the reasonableness of the fees requested, copies of litigation documents such as answers to interrogatories and deposition transcripts, and outside support for the level of fees charged, *e.g.*, surveys conducted by the American Intellectual Property Law Association ("AIPLA") showing

---

[3]FastShip's exhibits will be referred to as "PX __ at ___," reflecting the exhibit number and sub-exhibit designations, followed by the page number.

FastShip switched their designation of exhibits from numbers to double letters for the 12th exhibit, *i.e.*, what would be Exhibit 12 is actually Exhibit AA.

attorneys' fees an intellectual property litigation by area of the country for given years.[4]  Exhibits AA through QQ provide copies of various invoices that FastShip's counsel issued while litigating this case.[5]

In all, FastShip originally asked for $8,724,475.22 in combined attorneys' fees and related expenses, Pl.'s Br. at 53, comprised of $6,988,906.80 of attorneys' fees and $1,735,568.42 of fees for expert witnesses, *id.* at 43-44.  FastShip also requests $2,430,047.71 in its bill of costs.  Pl.'s Cost Br. at 57.

FastShip filed two supplements to its original requests for attorneys' fees and related expenses and bill of costs.  The first, a supplemental memorandum filed on December 4, 2018, included invoices for Dr. Richard Garwin (PX RR) and increased the amount of fees requested for his services from the original $180,610.66 to $196,264.75, raising the total attorneys' fees and related expenses to $8,740,129.31.  Pl.'s Suppl. Mem. in Supp. of Its Mot. for Atty's' Fees & Related Expenses ("Pl.'s Suppl. Mem."), ECF No. 196.  The second, filed on the same day, provided additional documentation (PX SS) for FastShip's requests for costs related to the services of Summit Global.  Pl.'s Suppl. Mem. in Supp. of Its Bill of Costs, ECF No. 197 (Summit Global's original invoices are contained within PX MM).

---

[4]Exhibit 2 is the declaration of Donald L. Stout in support of the reasonable cost application (PX 2); Exhibit 3 is the declaration of Raymond H. Lemisch in support of the reasonable cost application (PX 3); Exhibit 4 is the declaration of Howard Brod Brownstein in support of the reasonable cost application (PX 4); Exhibit 5 is the declaration of Roland K. Bullard, II, certifying the small entity status of FastShip (PX 5); Exhibit 6 is the declaration of David Giles in support of the reasonable cost application (PX 6); Exhibit 7 is a copy of the transcript of the deposition of Captain Casey Moton (PX 7); Exhibit 8 is a copy of the "Defendant's Responses to Plaintiff FastShip, LLC's Second Set of Interrogatories" (PX 8); Exhibit 9 is a copy of the transcript of the deposition of Dr. Frederick Stern (PX 9); Exhibit 10 is a copy of a two page excerpt from the "AIPLA 2017 Report of the Economic Survey" (PX 10); and Exhibit 11 is a copy of the USAO Attorney's Fees Matrix for 2015 to 2019 (PX 11).

[5]Exhibit AA is a copy of certain A2L Consulting" invoices (PX AA); Exhibit BB is a copy of certain "Above the Wave" invoices for Michael R. Bagdon (PX BB); Exhibit CC is a copy of certain "Aquipt" invoices (PX CC); Exhibit DD is a copy of certain "Brynteson Reporting, Inc." invoices (PX DD); Exhibit EE is a copy of certain "Capitol Process Services, Inc." invoices (PX EE); Exhibit FF is a copy of certain "DTI" invoices (PX FF); Exhibit GG is a copy of certain "For the Record, Inc." invoices (PX GG); Exhibit HH is a copy of certain "GreatBridge Consulting, Inc." invoices (PX HH); Exhibit II is a copy of certain "Gregory Edwards, LLC" invoices (PX II); Exhibit JJ is a copy of certain "In Data Corp." invoices (PX JJ); Exhibit KK is a copy of certain "LightSpeed LLC" invoices (PX KK); Exhibit LL is a copy of certain invoices for "Chris B. McKesson, PE" (PX LL); Exhibit MM is a copy of certain "Summit Global" invoices (PX MM); Exhibit NN is a copy of certain "Thornycroft, Giles & Associates" invoices (PX NN); Exhibit OO is a copy of certain "TSG Reporting" invoices (PX OO); Exhibit PP is a copy of certain "miscellaneous travel, expense and food invoices addressed to FastShip and its counsel in this case" (PX PP); and Exhibit QQ is a copy of "the summary of PACER charges incurred for certain client matters of Dentons US LLP" (PX QQ).

The government responded on December 28, 2018. *See* Def.'s Objs. to FastShip, LLC's Bill of Costs ("Def.'s Objs."), ECF No. 201; Def.'s Resp. to FastShip, LLC's Mot. for Atty's' Fees ("Def.'s Resp."), ECF No. 203. In the responses, the government contends FastShip should not be granted attorneys' fees, related expenses, or costs primarily because the government's position throughout the litigation was substantially justified. *See, e.g.*, Def.'s Resp.; Def.'s Objs. But assuming the court decides to award attorneys' fees and related expenses, the government contends that several of the fees charged by FastShip's counsel and expert witnesses should be reduced or disallowed for a variety of reasons. As for the bill of costs, the government does not dispute $1,226,372.91 of the costs alleged by FastShip. Def.'s Objs. at 5-6. The government disputed the remaining $1,203,248 for three reasons. *See id.* at 6-11. First, the government argues FastShip is not entitled to $546,372.91 of costs related to its bankruptcy and the management of the liquidating trust. *Id.* at 6-8. Second, the government contests FastShip's request for $637,389.38 of "U.S. Living Expenses" for Mr. Giles over a period of six years. *Id.* at 8-11. Third, and finally, the government contests $19,486 FastShip requests for costs related to its appeal to the Federal Circuit. *Id.* at 11-12.

FastShip replied to both of the government's responses on March 8, 2019. *See* Pl.'s Reply in Supp. of its Bill of Costs ("Pl.'s Bill of Cost Reply"), ECF No. 211; Pl.'s Reply; Pl.'s Second Suppl. Mem., ECF No. 213. In its response to the government's objections to its bill of costs, FastShip agreed to withdraw the $546,372.91 in requests for costs related to its bankruptcy. Pl.'s Bill of Costs Reply at 6. FastShip also withdrew the $637,389.38 request for living expenses for David Giles. *Id.* FastShip maintained its request for costs related to the appeal to the Federal Circuit and increased its requested costs of $19,486 to $33,450.30. *Id.* at 4-5.

A hearing was held on April 3, 2019. FastShip responded on June 12, 2019, to the court's order regarding clarification of aspects of the attorneys' fees requested. *See* Pl. FastShip, LLC's Resp. to the Court's Order of June 5, 2019 (Pl.'s Resp."), ECF No. 220.

## STATUTORY AUTHORIZATION: 28 U.S.C. § 1498(a)

Section 1498(a) of Title 28 permits a patent holder to sue the United States for patent infringement, stating:

> "Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture."

28 U.S.C. § 1498(a).

Litigation fees and expenses are at issue at this juncture. Prior to 1996, "reasonable and entire compensation" had not been delineated by the statute. *E.g.*, 28 U.S.C. § 1498(a) (1994). Courts previously interpreted the phrase to mean "just compensation" as "required by the Fifth Amendment for government takings by eminent domain." H.R. Rep. No. 104-373, at 2 (1995),

1996 U.S.C.C.A.N. 4173, 4174 (citing *Waite v. United States*, 282 U.S. 508, 509 (1931)).  The Fifth Amendment, however, does not itself require the United States to pay litigation expenses in eminent domain cases; "such fees and costs can only be authorized by statute." *Id.* (citing *United States v. Bodcaw Co.*, 440 U.S. 202, 203 (1979)).  Although Congress authorized "legal fees and costs in cases related to the taking of real property [under] the 'Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970,' . . . [n]o such provision exist[ed] [prior to 1996] . . . in the case where the government is found liable for taking a patent." *Id.* (citing the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("Uniform Relocation Act," 42 U.S.C. § 4654, and *Calhoun v. United States*, 453 F.2d 1385, 1395-96 (Ct. Cl. 1972)).  Further, as of 1995 "[n]o [patent] owner ha[d] yet been able to recover any of its litigation costs under the [Equal Access to Justice Act]," *id.*, 1996 U.S.C.C.A.N. at 4174, and this court had held in 1993 that the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, did not apply to patent owners suing the government under 28 U.S.C. § 1498(a), *see de Graffenried v. United States*, 29 Fed. Cl. 384, 386-88 (1993).

Endeavoring to "help small business, independent inventors and nonprofit organizations recover the legal costs associated with defending their patents when the [f]ederal government is found liable for taking and using them," Congress amended 28 U.S.C. § 1498(a) in 1996 to define "'reasonable and entire compensation' to include attorney's fees and costs."  H.R. Rep. No. 104-373, at 1-2, 6, 1996 U.S.C.C.A.N. at 4174-75, 4178; *see also* Pub. L. No. 104-308, 110 Stat. 3814 (1996) (amending 28 U.S.C. § 1498(a)).  Attorneys' fees and costs were made available for patent owners who are either "independent inventor[s], a nonprofit organization, or an entity that had no more than 500 employees at any time during the 5-year period preceding [infringement by the United States]." 28 U.S.C. § 1498(a).  While the original proposal in the House of Representatives conditioned attorneys' fees and costs solely on finding the government liable, *see* 141 Cong. Rec. 36,190 (1995) (statement of Rep. Moorhead), the bill as enacted after a Senate amendment allowed the government to avoid paying attorney's fees and costs if the court found either that "the position of the United States was substantially justified or that special circumstances make an award unjust," 28 U.S.C. § 1498(a); *see also* 142 Cong. Rec. 27,243 (1996) (statement of Sen. Lott) (proposing amendment to H.R. 632).  In its current form, 28 U.S.C. § 1498(a) now reads:

> "Reasonable and entire compensation shall include the owner's reasonable costs, including reasonable fees for expert witnesses and attorneys, in pursuing the action if the owner is an independent inventor, a nonprofit organization, or an entity that had no more than 500 employees at any time during the 5-year period preceding the use or manufacture of the patented invention by or for the United States. Not[]withstanding the preceding sentences, unless the action has been pending for more than 10 years from the time of filing to the time that the owner applies for such costs and fees, reasonable and entire compensation shall not include such costs and fees if the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust."

28 U.S.C. § 1498(a).

## JURISDICTION & STANDING

### A. FastShip is a Qualifying Successful Plaintiff

FastShip prevailed on its infringement claim, *FastShip III*, 131 Fed. Cl. 592, and both parties agree that FastShip qualifies under the size limits imposed by the statute, *see* Def.'s Objs. at 3.

### B. Post-Appellate Jurisdiction over the Claim for Attorneys' Fees and Expenses

In its post-trial opinion, this court directed "judgment pursuant to RCFC 54(b) respecting the reasonable and entire compensation *for infringement*," and allowed FastShip to apply for costs and attorneys' fees as allowed by 28 U.S.C. § 1498(a) following the end of any appellate process. *FastShip III*, 131 Fed. Cl. at 627-28 (emphasis added). The question of whether the court may act under 28 U.S.C. § 1498(a) to first award compensation for the government's unauthorized use and then award the owner's costs in successfully pursuing an infringement action was addressed as an issue of first impression in a decision by this court, *Hitkansut LLC v. United States*, 142 Fed. Cl. 341 (2019). In *Hitkansut*, the court held that it

> "finds nothing within the text of 28 U.S.C. § 1498(a), appearing either expressly or arising inferentially from a natural reading, or among interpretations of similar statutes, that deprives this court of the ability to make an award of fees and expenses separate from an award of compensation regarding infringement. Accordingly, this court concludes that it retains jurisdiction under the statute to adjudicate Hitkansut's motion for fees and costs."

*Hitkansut*, 142 Fed. Cl. at 345. Here, unlike *Hitkansut*, the government does not pose a challenge to FastShip's ability to bring a claim for attorneys' fees and costs *after* an appeal on the merits regarding infringement.[6] The court follows *Hitkansut* and holds that it retains jurisdiction to hear FastShip's claim for attorneys' fees and costs under 28 U.S.C 1498(a).

### C. Standing – Real Party in Interest

What the government does challenge, however, is whether FastShip is a real party in interest due to a litigation financing agreement. *See* Hr'g Tr. 34:15 to 42:17 (Apr. 3, 2019).[7] The government "believe[s] that the court should . . . reject costs and fees in this particular case because FastShip is not the real party in interest." Hr'g Tr. 34:17-20. Instead, the government argues that "IPCo. is the real party in interest," Hr'g Tr. 37:19-21, and that due to "other factors . . . [such as] the relationship [between IPCo., Dentons, and FastShip], [] the apparent non-arm's-length transactions as far as invoicing [, and] the magnitude of the contingent fee," the request for attorneys' fees and costs is "outside the realm of reasonableness," Hr'g Tr. 39:12-17.

---

[6]The government does briefly acknowledge that the issue exists. See Def.'s Objs. at 11; Def.'s Resp. at 34 n.20.

[7]Subsequent references to the hearing will omit the date.

Because standing to bring a motion for attorneys' fees and costs after a successful claim for patent infringement against the United States is a relatively novel issue, the court will first examine standing for attorneys' fees under 28 U.S.C. § 1498(a) generally before turning to litigation financing agreements specifically.

    *1.  Standing for attorneys' fees under 28 U.S.C. 1498(a) generally.*

    As a preliminary matter, the court in *Hitkansut* noted that the Court of Appeals for the Federal Circuit has held that "[g]enerally, 'awards of attorneys' fees where otherwise authorized are not obviated by the fact that individual plaintiffs are not obligated to compensate their counsel [because] an attorney-client relationship suffices to entitle prevailing litigants to receive fee awards.'" *Hitkansut*, 142 Fed. Cl. at 353 (quoting *Ed A. Wilson, Inc. v. General Servs. Admin.*, 126 F.3d 1406, 1409 (Fed. Cir. 1997)) (in turn quoting *Rodriguez v. Taylor*, 569 F.2d 1231, 1245 (3d Cir. 1977)).  The court found support for its interpretation from three other fee-shifting statutes, which indicated that a contingency arrangement should not bar recovery of attorneys' fees.  *Id.* at 353-54.

    First, the court turned to the Back Pay Act for guidance.  *See Hitkansut*, 142 Fed. Cl. at 353.

    The Back Pay Act provides that a government employee who is wrongfully deprived pay 'is entitled, on correction of the personnel action, to receive . . . reasonable attorney fees . . . [that] shall be awarded in accordance with the standards established under § 7701(g) of this title.' 5 U.S.C. § 5596(b)(1)(A). Section 7701(g), in turn, requires, among other things*,* that the fees awarded be 'incurred' by the employee, 5 U.S.C. § 7701(g)(1), or be awarded 'as part of the costs,' 42 U.S.C. § 2000e-5 (cited by 5 U.S.C. § 7701(g)(2)).

*Id.*; *see also Raney v. Federal Bureau of Prisons*, 222 F.3d 927, 934 (Fed. Cir. 2000) ("[R]estrict[ing] 'reasonable attorney fees incurred' to 'reasonable attorney fees actually incurred' constitutes precisely the type of legislative rewrite that any court should avoid.  It imposes a limitation which Congress neither expressed nor intended.") (internal citations omitted).

    The court next turned to EAJA for guidance.  *See Hitkansut*, 142 Fed. Cl. at 354.  Similar to the Back Pay Act, EAJA permits a court to "award reasonable fees and expenses of attorneys" and "fees and expenses . . . *incurred* by that party . . . ." *Id.* (citing 28 U.S.C. § 2412(b), (d)(1)(A) (emphasis added)).  The court found support for this interpretation, *i.e.*, that the plaintiff "incurred" attorneys' fees under EAJA despite its "insurer being responsible for paying them," from the Federal Circuit's holding in *Ed A. Wilson, Inc. Id.* (quoting *Ed A. Wilson*, 126 F.3d at 1409) ("[I]t is well-settled that an award of attorney fees is not necessarily contingent upon an obligation to pay counsel. Generally, awards of attorneys' fees where otherwise authorized are not obviated by the fact that individual plaintiffs are not obligated to compensate their counsel.").

    Finally, the court examined the Uniform Relocation Act.  *Hitkansut*, 142 Fed. Cl. at 354.  In contrast to EAJA or the Back Pay Act, the attorneys' fees provision of the Uniform Relocation

Act requires the court to "reimburse [the] plaintiff for his reasonable costs, disbursements, and expenses . . . actually incurred because of such proceeding." *Id.* (citing 42 U.S.C. § 4654(c)). In *Washington Metro. Area Transit Auth. v. United States*, 57 Fed. Cl. 148, 152-53 (2003), this court held that the use of "reimburse" and "actually incurred" in the Uniform Relocation Act distinguished that statute from the Back Pay Act as interpreted by the Federal Circuit in *Raney.* Accordingly, the court restricted attorneys' fees to those actually incurred by the plaintiff. *Id.* This court has applied similar reasoning in other cases under the Uniform Relocation Act. *E.g.*, *Lost Tree Vill. Corp. v. United States*, 135 Fed. Cl. 92, 98-99 (2017) (allowing reimbursement of fees actually paid by the plaintiff but rejecting a "success fee" that was contractually recoverable only from the "government as part of the reasonable attorney's fees" owed to the plaintiff); *but see Shelden v. United States*, 41 Fed. Cl. 347, 357 (1998) (construing the Uniform Relocation Act to be comparable to EAJA).

### 2. *FastShip's litigation financing agreement with IPCo.*

In this case, an unrelated third-party (IPCo.) provided an initial payment of $600,000 to plaintiff's primary counsel of record (Dentons). Hr'g Tr. 35:19-25. Adding further difficulty is the fact that one of the attorneys of record for FastShip, Mr. Donald Stout, is also a "Joint Member and Manager" of IPCo. *See* Def.'s Resp. at 36; PX 2 at 2.[8] In short, one of the parties that was financing the litigation was managed by one of the attorneys who worked on the case. The concern of the government, then, is that the transactions were not at arm's length, *i.e.*, that the fees are "from one counsel of record to the other counsel of record." Def.'s Resp. at 37. FastShip counters that it is "the real party in interest" because it is comprised of a "group of shareholders that continue to work in their area." Hr'g Tr. 61:13-18. It further contends that Dentons did not have a relationship with IPCo. beyond the initial retainer. Hr'g Tr. 62:15-19. FastShip also avers that Mr. Stout was an integral member of the trial team, not a silent partner. Hr'g Tr. 61:19-24.

The subject of litigation financing is a controversial one. Several circuits around the country have amended their local rules to require disclosure of litigation financing agreements with third parties that have a financial interest in the outcome.[9] These rules, however, are

---

[8]Mr. Stout is also the Registered Agent for IPCo. PX 2 at 2-3 (Stout Decl.).

[9]*See, e.g.*, 3rd Cir. L.A.R. 26.1.1(b) ("Every party to an appeal must identify on the disclosure statement required by [Federal Rule of Appellate Procedure] 26.1 every publicly owned corporation not a party to the appeal, if any, that *has a financial interest in the outcome* of the litigation and the nature of that interest.") (emphasis added); 4th Cir. R. 26.1(a)(2)(B) ("A party must identify any publicly held corporation . . . that has a *direct financial interest in the outcome of the litigation* by reason of a franchise, lease, [or] other profit sharing agreement.") (emphasis added); 5th Cir. R. 28.2.1 (Counsel . . . must certify a complete list of all [parties] who or which are *financially interested in the outcome* of the litigation); 6 Cir. R. 26.1(b)(2) ("Whenever . . . a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a *substantial financial interest in the outcome* of litigation, counsel for the party . . . shall advise the clerk.") (emphasis added); 10th Cir. R. 46.1(D)(1) & (2) ("Each entry of appearance must be accompanied by a certificate listing the names of all interested parties not in the caption . . . . [T]he certificate must list all [parties] that are *financially interested in the*

focused on disclosure and transparency; they do not ban or disfavor litigation financing agreements.  Indeed, the government concedes as much.  *See* Hr'g Tr. 38:9 to 39:23.

Regardless, this court has not yet adopted any rules regarding litigation financing agreements.  Yet, even if this court *had* adopted a local rule mandating the disclosure of litigation financing agreements, the court is, and has been, aware of IPCo.'s role in the litigation.  As the involvement of Mr. Stout makes evident, at no point was the court in the dark regarding his status.

In addition, nothing about Mr. Stout's role as a counsel of record and litigation financer suggests that a conflict exisits.  These two roles are independent of one another and there is no evidence in the record that Mr. Stout acted improperly.  FastShip represents that Mr. Stout was an integral member of a "lean[]" trial team and one of three individuals who conducted depositions.  Hr'g Tr. 61:19 to 62:1.  Mr. Hogge also stated that he "made it a requirement that [Mr. Stout] help [him] try this case" because of their long experience trying jury cases "opposite each other" over the last "20 years."  Hr'g Tr. 61:19-24.  FastShip argues that Dentons, the counsel of record, did not "have a relationship with IPCo. . . . We didn't sign any agreement.  We don't bill IPCo.  We never did.  And we just looked to IPCo. to cover the expenses."  Hr'g Tr. 62:15-19.

The very point of fee-shifting statutes is to permit small entities, *i.e.*, ones that could not normally survive the gauntlet of litigation, to assert their rights.  *See, e.g.*, *Commissioner, I.N.S. v. Jean*, 496 U.S. 154, 163 (1996); *Raney*, 222 F.3d at 935.  Suing the United States government is a daunting task.  It is an opponent with vast resources and a legion of highly skilled attorneys at its disposal.  Even with the assistance of shifted or contingent fees, claims may fall into the gray area of uncertainty and cannot attract counsel.  Litigation financing agreements help bridge this divide by providing the attorney of record a source of guaranteed fees for their work, while granting the financer a share of the proceeds if the case is successful.  Here, IPCo. acted as that bridge, covering the gap between claim and litigation, allowing FastShip to successfully pursue their infringement case.  Preventing recovery based on such an agreement would be anathema to the underlying purpose of fee-shifting statutes.

Like the patent system as a whole, litigation financing agreements can occasionally be susceptible to abuse.  *See, e.g.*, *In re Packard*, 751 F.3d 1307, 1325 & n.21 (Fed. Cir. 2014) (discussing "patent trolls" and how they waste scarce judicial resources with unworthy claims); *see also* Derek Thompson, *The Most Expensive Comment in Internet History?*, The Atlantic (Feb. 23, 2018), https://tinyurl.com/yy62a4l5 (detailing the dark campaign by Peter Thiel to destroy a gossip website using secretly funded litigation).  But the possibility of abuse does not mean the entire system should be discarded.  Instead, courts have focused on the *disclosure* of such agreements to encourage transparency and ensure a shadow broker is not using litigation as

---

*outcome* of the litigation.") (emphasis added); 11th Cir. R. 26.1-1(a)(1), -2(a) ("Every party and amicus curiae [] must include a certificate . . . [that] must contain a complete list of all [parties] that have an *interest in the outcome* of the particular case.") (emphasis added).  Various district courts have adopted similar local rules.

a form of harassment or for multiple bites at the same apple.  Disclosure also enables judges to appropriately evaluate potential recusal due to conflicts of interest.

At bottom, FastShip will need to pay Dentons for its legal representation in this litigation. That payment, if attorneys' fees and expenses are not awarded, would reduce the recovery received by FastShip for the infringement.  Thus, as the Federal Circuit and this court have routinely held, "in this sense, '[a plaintiff who must turn over any fee award to the attorney per their agreement] incurs the attorney fees that may be awarded.'"  *Hitkansut*, 142 Fed. Cl. at 354 (quoting *Phillips v. General Servs. Admin.*, 924 F.2d 1577, 1582 (Fed. Cir. 1991)).

For the reasons stated, the court finds that FastShip is the real party in interest and has standing to bring a motion for attorneys' fees and costs.

## ANALYSIS

At issue is the "reasonable and entire compensation" available to a qualifying plaintiff who has made a successful showing that the United States infringed upon an owner's patent.  28 U.S.C. § 1498(a).  That compensation "shall include the owner's reasonable costs, including reasonable fees for expert witnesses and attorneys."  *Id.*  To obtain an award, the court must find that the position held by the United States was not "substantially justified or that special circumstances would make an award unjust."  *Id.*  There is an exception, however, that allows the court to award attorneys' fees and costs regardless of whether the United States was substantially justified if "the action has been pending for more than 10 years from the time of filing to the time that the owner applies for such costs and fees."  *Id.*  In short, a successful plaintiff is eligible for attorneys' fees and costs under 28 U.S.C. 1498(a) if the plaintiff demonstrates that the action has been pending for more than ten years or if the government does not carry its burden of that showing that it was substantially justified.

## I.     Whether This Action Has Been Pending For More Than 10 Years

In its brief, FastShip attempts to short-circuit the substantially-justified analysis by arguing that its request for attorneys' fees and costs satisfies the 10 year exception of 28 U.S.C. § 1498(a).  *See* Pl.'s Br. at 11-14 (citing 28 U.S.C. 1498(a)).  FastShip does not contend that they filed their complaint with this court more than 10 years ago.  Rather, FastShip argues that because it filed its administrative claim notifying the Navy of infringement in 2008, and because "the pre-suit conduct of the [g]overnment during an administrative claim is relevant to . . . [whether] the [g]overnment's position is justified for the purposes of assessing whether attorney[s'] fees and related expenses should be awarded," the 2008 administrative claim should be considered the "action" under 28 U.S.C. 1498(a).  Pl.'s Br. at 13.[10]

The government counters that the "plain language" of 28 U.S.C. 1498(a) needs no elaboration and that the "'the action' was pending for six years, two months and four days, which is [] less than ten years."  Def.'s Resp. at 6-7.  According to the government, the court "must

_____

[10]FastShip also cites the tolling provisions of 35 U.S.C. § 286 (as applicable to 28 U.S.C. § 2501) as analogous support for its proposition.

evaluate whether the [g]overnment's 'position' was 'substantially justified,' before it can award attorney and expert witness fees." *Id.* at 8 (citing 28 U.S.C. § 1498(a)).

The court does not find FastShip's argument to be persuasive. Nothing in the statute allows for consideration of administrative claims. Instead, the statute states that the exception only applies when the "*action* has been pending for more than 10 years." 28 U.S.C. § 1498(a) (emphasis added). And the "action" is specified in the subsection by the earlier reference that the "owner's remedy shall be by *action* against the United States in the United States Court of Federal Claims for the recovery." 28 U.S.C. § 1498(a). Thus to be an "action" eligible for the 10-year exception, it must be one filed with this court. Here, FastShip filed their complaint with this court on August 1, 2012, and filed their petition for attorneys' fees on October 4, 2018. *See* Compl.; Pl.'s Br. As the government notes, this is six years, two months, and four days apart – well short of the 10 years as required by 28 U.S.C. 1498(a). Under established principles of statutory interpretation, *see, e.g.*, *Babbitt v. Oglala Sioux Tribal Pub. Safety Dep't*, 194 F.3d 1374, 1378-79 (Fed. Cir. 1999), the court cannot override by inference what is made explicit in the statute. Thus, the court finds that the *action* in this case has been pending for less than 10 years and therefore must turn to whether the government's position was substantially justified to determine whether attorneys' fees and expenses are available.

## II.    Whether The Government's Position Was Substantially Justified

As a qualifying prevailing plaintiff, FastShip is entitled to an award of its costs, to include "fees for expert witnesses and attorneys" if "reasonable . . . in pursuing the action" unless "the position of the United States was substantially justified or [] special circumstances make an award unjust." 28 U.S.C. § 1498(a).

### A.    *"Substantially Justified"*

The statute does not define when the government's position is substantially justified, and neither the Supreme Court nor the Court of Appeals for the Federal Circuit have interpreted "substantially justified" in the context of 28 U.S.C. § 1498(a). Nonetheless, in *Hitkansut*, the court concluded that the "substantially justified" language of 28 U.S.C. 1498(a) should be interpreted in the same manner as the "substantially justified" language in EAJA. *Hitkansut*, 142 Fed. Cl. at 356. The court based this on a previous decision that "interpreted the term in a manner consistent with EAJA," *id.* (citing *Wright v. United States*, 56 Fed. Cl. 350, 352 (2003)), and on the "limited legislative history," *id.* (citing H.R. Rep. No. 104-373, at 2-3, 7, 1996 U.S.C.C.A.N. at 4174-75, 4179; 142 Cong. Rec. 27,243 (1996)).[11] The court thus adopts EAJA's interpretation of "substantially justified" for purposes of 28 U.S.C. 1498(a).

---

[11]The legislative history on the "substantially justified" language is thin. The original bill amending 28 U.S.C. § 1498(a) in the House of Representatives was "not conditioned upon 'the government's litigation position [not being] substantially justified.'" *Hitkansut*, 142 Fed. Cl. at 356 (citing H.R. Rep. No. 104-373, at 7, 1996 U.S.C.C.A.N. at 4179 (mentioning EAJA and the "substantially justified" standard)). This, however, raised concerns within the Department of Justice, which commented "that the bill created 'a more expansive award' than was available to other claimants against the government." *Id.* (citing H.R. Rep. No. 104-373, at 7, 1996

Under EAJA, the government's position is "substantially justified" when it is "justified in substance or in the main – that is, justified to a degree that could satisfy a reasonable person, [which is] no different from the 'reasonable basis both in law and fact' formulation." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted) (citations omitted). The court's inquiry must "focus[] on the governmental misconduct giving rise to the litigation," *Jean*, 496 U.S. at 165, and must examine "the entirety of the government's conduct and make a judgment call whether the government's overall position had a reasonable basis in both law and fact," *Chiu v. United States*, 948 F.2d 711, 715 (Fed. Cir. 1991) (footnotes omitted). And, as the court previously concluded "[t]he government bears the burden of demonstrating that its position was substantially justified." *Hitkansut*, 142 Fed. Cl. at 356 (quoting *Wright*, 56 Fed. Cl. at 352 (in turn citing *Doty v. United States*, 71 F.3d 384, 385 (Fed. Cir. 1995)).

### B. *The Government's Pre-Litigation Conduct*

The government contends that its pre-litigation conduct should have no bearing on whether its position in the litigation was substantially justified. Def.'s Resp. at 9-11. In its brief, the government argues that "[28 U.S.C.] § 1498 does not include EAJA's definition of 'position of the United States,' nor is there any suggestion that Congress intended to waive sovereign immunity for pre-litigation conduct when it amended that section to permit awards of attorneys' fees." *Id.* at 10. FastShip, on the other hand, argues that the government's pre-litigation conduct should be considered in determining whether or not the government was "substantially justified." *See* Pl.'s Br. at 13-18. It contends that "the pre-suit conduct of the [g]overnment during an administrative claim is relevant to the consideration of whether . . . attorney[s'] fees and related expenses should be awarded." *Id.* at 13.

The government made similar arguments in *Hitkansut* regarding its pre-litigation conduct. The court rejected those arguments then, *Hitkansut*, 142 Fed. Cl. at 356-58, and does so now:

> The text of 28 U.S.C. § 1498(a) refers to a single 'position of the United States.' The statute makes no distinction between the pre-litigation position and the position taken once litigation commences. There is nothing inherent in the phrase that would confine its scope to only the position taken by the Department of Justice during litigation or only to the position taken by the government after a certain point.

*Id.* at 357. The court's decision is based in precedent, both recent and firmly rooted. *See, e.g.*, *Jean*, 496 U.S. at 158-60 (The inquiry "properly focuses on the governmental misconduct *giving rise* to the litigation.") (emphasis added); *Pierce*, 487 U.S. 552, 565 (1988) (The "substantially justified" standard requires the government's overall position to have a "reasonable basis both in law *and fact*.") (emphasis added) (citations omitted); *Hitkansut*, 142 Fed. Cl. at 357

---

U.S.C.C.A.N. at 4179). In response, the "substantially justified" standard was "added later via amendment of the bill by the Senate." *See id.* (citing 142 Cong. Rec. 27,243 (proposing the amendment that added the "substantially justified" standard)). The Senate's amendment was adopted without discussion. *Id.*

("[R]eference to the 'position of the United States' requires a threshold determination regarding substantial justification encompassing the government's *entire* conduct.") (emphasis in original).

Further, the government's argument regarding pre-litigation conduct creates the same practical issue that the court highlighted in *Hitkansut*. "The court cannot determine whether the government's position during litigation was justified without examining the underlying facts relating to the government's conduct. A reasonable basis requires more than conceptual arguments germane to the subject matter; arguments must also hue to the facts. That a litigation postion may be reasonable in the abstract . . . does not mean that the litigation position as applied to a specific case remains reasonable." *Hitkansut*, 142 Fed. Cl. at 357.

The government's position takes a myopic view of the "position of the United States." The very decision to litigate through trial and appeal, as opposed to settling before or at an early stage of the litigation, could be viewed as not "substantially justified." For example, if the government infringed on the rights of a patent holder but decided to wage a lengthy and protracted litigation in hopes of prevailing through attrition, that position would not be "substantially justified." Indeed, the point of the amendments to 28 U.S.C. 1498(a) in 1996 was to allow smaller entities to obtain compensation when the government takes their property through infringement. Allowing the government to use its resources to drown legitimate claims would defeat the statute's purpose. Accordingly, the court reaffirms its decision in *Hitkansut* that *all* of the government's conduct is considered when determining whether the position of the United States was "substantially justified."

## C. *The Government's Entire Conduct*

The relevant inquiry is whether the government has demonstrated that the positions it took, including those taken by its contractor, were such that a reasonable person could conclude that its position was supportable. *See Pierce*, 487 U.S. at 565 (Substantially justified means "justified to a degree that could satisfy a reasonable person."). Again, this inquiry "properly focuses on the governmental misconduct giving rise to the litigation." *Jean*, 496 U.S. at 165. As this court held in *Hitkansut*, the government can be found liable for infringement and still be found to have advanced a substantially justified position. *Hitkansut*, 142 Fed. Cl. at 358. The court's inquiry, then, is the totality of the steps the government took both before and during the litigation.

The government argues that its position throughout the dispute was substantially justified. *See generally* Def.'s Resp. at 11-31. It avers that "Congress did not intend the substantially justified standard to raise a presumption that the [g]overnment position was not substantially justified simply because it lost the case." Def.'s Resp. at 11 (citing *Scarborough v. Principi*, 541 U.S. 401, 415 (2004)) (additional citation omitted). In short, the government believes its conduct was substantially justified when viewed in totality, despite losing at both the trial and appellate level. First, the government avers that its non-infringement defenses were reasonable and substantially justified. *Id.* at 12-17. Second, the government states that FastShip's contentions that the government "willfully infringed" the patents-in-suit cannot be considered in the analysis under Section 1498(a). *Id.* at 17-19. Third, the government argues that the Navy's investigation and denial of FastShip's administrative claim was reasonable and substantially justified. *Id.* at 19-22. Fourth, the government points to the relatively low damages awarded to FastShip based

on exclusion of all *Freedom* class ships besides the LCS-1, *id.* at 23-24, and on its success in limiting FastShip's recovery to "reasonable and entire compensation" instead of royalties, *id.* at 25.  Finally, the government points to its concessions during the litigation and that it "only chose to appeal the defense related to the 'increased efficiency' requirement of the [patent] claims" as evidence of "its deliberation and considered actions." *Id.* at 26.

FastShip counters with positions taken by the government that were found to be meritless.  Prominent among these examples are the Navy's actions during the administrative claim from 2008 to 2010 and several positions taken by the government during litigation that were contradicted by its own experts or witnesses at trial.  Pl.'s Br. at 17-18, 20-27.  FastShip also points to the government's use of a model for testing that did not "accurately reflect the profile of the LCS vessels," which resulted in inaccurate test data presented at trial. *Id.* at 27-29.  Finally, FastShip notes the government's "clumsy misrepresentation of Figure 11" of the patents, a chart that measured the efficiency of the LCS-1 compared to a displacement hull. *Id.* at 29-31.  According to FastShip, the government used the wrong units, *i.e.*, imperial instead of metric, which purposely understated the LCS-1's increase in efficiency over a standard hull. *Id.*  And despite being told of this basic error on the first day of trial, the government continued its "stubborn[] reli[ance]" on Figure 11 throughout trial and on appeal. *Id.* at 30.

The conduct of the government, both before and throughout this litigation, belies its argument that it was "substantially justified."  Indeed, prior to the filing of this litigation in 2012, the government and its contractors took several unreasonable steps.  During procurement, the government contractor that eventually won the *Freedom* class contract, Lockheed Martin, met with FastShipt to discuss how FastShip's technology could contribute "to the team." *FastShip III*, 131 Fed. Cl. at 601.  Despite this meeting, where information related to FastShip's patents was shared and a confidentiality agreement was signed, and despite the inclusion in the proffered design of a "semi-planing monohull" that would allow the *Freedom* class of LCS to achieve high sprint speeds, *id.* at 602, FastShip was not included as a part of the team that eventually won and constructed the LCS-1, *id.* at 601-03.  Lockheed Martin would go on to manufacture the *Freedom* class of ships for the government, with a completion and infringement date for LCS-1, of September 26, 2006. *Id.* at 622-23.

The government's actions during the administrative claim period from 2008 to 2010 also undercut its position.  After realizing that the LCS-1, and thus the design for the *Freedom* class ships, infringed upon its patents, FastShip filed an administrative claim with the Navy on April 11, 2008. *See FastShip III*, 131 Fed. Cl. at 606 n.15 (citing Trial PX 200).  The Navy sat on the claim for the next two years. *Id.*  Finally, in response to additional inquiries by FastShip, the Navy issued a short, two-page denial.  Trial PX 200.  The letter to FastShip stated that the Navy conducted a "thorough analysis," but it did not include that analysis, if it occurred.  Trial PX 200.  At best, this was a perfunctory response to the concerns of FastShip that ultimately proved legitimate.  At worst, it may have delayed FastShip's filing of its claim in this court by two years.

The government's positions after the start of litigation create similar problems for its attempt to establish reasonable justification.  The government argued against the validity of the '032 and '946 patents, contending that both patents were obvious (and therefore unpatentable) and both failed the enablement requirement under 35 U.S.C. § 112. *See FastShip III*, 131 Fed.

Cl. at 618-22.  The court found those two arguments by the government to be unjustified.  *See generally id.* at 620-21, 622, 627.  At trial, the government advanced flawed arguments in trying to deny that LCS-1 infringed on FastShip's patents.  One of the government's principal experts, Dr. Frederick Stern, made several serious mistakes in his analysis and testimony.  *See FastShip III*, 131 Fed. Cl. at 616.  The court afforded the testimony of Dr. Stern "little weight . . . because it fails to take into account key characteristics of the performance of the model-scale and full-size LCS-1."  *Id.*  Further, Dr. Stern "overestimated the force of the waterjets [on the hull of the ship] by *a factor of four*, which introduces errors."  *Id.* (emphasis added).  Finally, Dr. Stern also "fail[ed] to account for the scaling of the hydrodynamic boundary layer," which "also introduce[d] error into [his] calculations."  *Id.*  In other words, one of the government's primary expert witnesses made repeated errors in his analysis that all happened to show it was less likely the LCS-1 infringed on the FastShip's patents.  This is not reasonable conduct.

The government, as noted earlier with reference to "Figure 11" of the patents, also used incorrect units in its attempt to prove that the LCS-1's design did not increase its efficiency, *i.e.*, that its design did not infringe.  *See FastShip III*, 131 Fed. Cl. at 617-18.  This change, although subtle, made the LCS-1 displacement hull appear to be less efficient.  *Id.*[12]  The government's expert used the wrong units in his analysis, in essence rejecting the very rationale for the displacement type hull and the LCS program, *i.e.*, for "new ships that could be used for 'focused missions' at high speeds."  *Id.* at 600.  The government, through its erroneous analysis, was essentially arguing that the design it chose for its efficiency, was, in fact, not efficient.

The government also persisted in arguing against the validity of the '032 and '946 patents, contending that "a combination of prior art references . . . renders the [two patents] obvious under 25 U.S.C. § 103."  *FastShip III*, 131 Fed. Cl. at 618-21.  In support of its position, the government introduced the testimony of Mr. Donald Blount.  According to the government, because Mr. Blount performed a "feasibility analysis" that combined prior art references, the patents at issue "would have been obvious to a person of ordinary skill in the art before the priority date."  *Id.* at 619.  The court, however, found that Mr. Blount had "extraordinary skill," *id.* at 619-20, *i.e.*, he was an individual with "over three decades of experience as a naval architect, [and who had] published numerous articles in the field and served as the department head for the Combatant Craft Engineering Department within the Navy," *id.* at 620.  Mr. Blount had performed his analysis in connection with his proprietary design of the *Destriero*, a private yacht that would "operate in a semi-planing condition when at full load and in a planing mode when lightly loaded."  *Id.* at 619.  Although the government proffered him as a person of ordinary skill in the art in attempting to prove that the "patented invention [was] obvious," *id.* at 619, it was unreasonable to do so given his decades of experience, and the design work he was conducting for a yacht not comparable to a larger ship, while working at the same time Mr. Giles was conducting experiments and obtaining the patents at issue.  Notably, the parties had agreed to a definition for a person of ordinary skill in the art before trial.  *See id.* at 620.[13]

---

[12]And, as FastShip correctly observes, the government's error was pointed out to them by Mr. Giles on the first day of trial.  Pl.'s Br. at 31; *see also* Trial Tr. 65:11 to 67:6, 205:3-20.

[13]The parties "agree[d] that a person having ordinary skill in the art would have a 'bachelor's degree in naval architecture, hydrodynamics, or marine engineering, or equivalent

As for the enablement requirement, the government at trial attempted to argue that the "specification of the [two patents] only discloses one mode of practicing the invention," and was therefore invalid. *FastShip III*, 131 Fed. Cl. at 621. But the court found the government's position counter to established patent law that permits "describing a single mode of practicing the invention." *Id.* (citing *Epistar Corp. v. International Trade Comm'n*, 566 F.3d 1321, 1336 (Fed. Cir. 2009)). The court does not find this conduct to be substantially justified.

As for compensation, the government is correct in arguing that the amount of damages that FastShip eventually received was smaller than claimed because the *Freedom* class of vessels later than LCS-1 were not manufactured before the patents expired. But, the primary issue was whether the government infringed on FastShip's patents. Although the government may have forestalled FastShip from obtaining the recovery it originally sought, that does not change the fact that the positions it took with regards to *infringement*, from the conduct of Lockheed Martin through trial, were unreasonable. In this respect, the government's position is substantially justified during the litigation in getting summary judgment granted in their favor with regards to the LCS-3 and the other *Freedom* class ships. *See* Def.'s Resp. at 22-25. According to the government, because it was successful in reducing the amount of damages paid to FastShip, its overall position to litigate was justified. *Id.* But this position takes a cabined view of the court's decision. The claims regarding the LCS-3 and later *Freedom* class ships were, in effect, time barred due to the court's interpretation of "manfaucture." *See FastShip II*, 122 Fed. Cl. at 82-86. The court, affirmed by the Federal Circuit, found that the government did not "manufacture" the LCS-3 and later ships in accordance with 28 U.S.C. § 1498(a) because the patents had expired. *Id.*, *see also FastShip IV*, 892 F.3d at 1303-08. Further, because the court is to consider the "totality of the circumstances" in conducting its inquiry, the government's position *as a whole* is not substantially justified even though it may have taken reasonable stances in some respects.

The burden in proving reasonableness is on the government, and the court finds the government has failed to carry that burden in this case. Although parts of the government's conduct could be seen as reasonable when viewed in isolation, its overall conduct demonstrates its position was ultimately not "substantially justified" when viewed in totality.

### III.   The Appropriate Amount of Fees, Expenses, and Costs

As an initial matter, the government argues that the fees charged by FastShip's counsel are too high and should be reduced for a variety of reasons. The government also specifically challenges several of the costs charged by FastShip. First, the government argues that FastShip should not receive an award for any fees related to the LCS-3 summary judgment. Def.'s Resp. at 32. Second, the government argues FastShip's fees for a "computational analysis in Sweden" should not be awarded. *Id.* at 32-33. Further, the government avers that the fees for FastShip's appeal to the Federal Circuit should be disallowed. *Id.* at 33-34. Next, the government states that FastShip should not be granted fees for its earlier motions to compel production of documents from General Dynamics and Austal. *Id.* The government also challenges fees for attorneys "whose experience, role, and tasks have not been justified." *Id.* at 34. Finally, the government contends that the approximately $1.7 million in expert witness fees should be

---

work experience in the same fields.'" *FastShip III*, 131 Fed. Cl. at 620 (citing Def.'s Post-Trial Br. at 41, ECF No. 166).

reduced – specifically targeting the approximately $1.5 million in fees charged Ms. Krista Holt, FastShip's damages expert. *Id.* at 40-43. To properly evaluate the fees requested by FastShip, the court will first determine whether any of the individual components identified by the government are ineligible for fees before examining whether FastShip's fees and hours are reasonable.

A. *Fees for Various Discrete Aspects of this Litigation*

1. *The dismissal of the LCS-3 claim.*

The government argues that FastShip should not receive any fees for its work related to the LCS-3. Def.'s Resp. at 32. "Since the [c]ourt determined that LCS-3 did not infringe because it was incomplete, FastShip is not entitled to recover any of those fees that it claims relating to LCS-3." *Id.* FastShip counters that the "LCS-1 and LCS-3 are very similar vessels . . . [and] FastShip utilized a significant amount of evidence that focused on the LCS-3 in its successful proof of infringement by the LCS-1." Pl.'s Br. at 50. It avers that due to the "importance of [the] evidence regarding the LCS-3 to show infringement by the LCS-1," FastShip is entitled for attorneys' fees for its work on the LCS-3. *Id.* at 51.

The court agrees with FastShip. The claims related to LCS-1 and LCS-3 were closely linked. The question presented with respect to LCS-3, the judicial interpretation of the term "manufacture," was an issue of first impression for the court, *see FastShip II*, 122 Fed. Cl. at 80, and for the Federal Circuit, *see FastShip IV*, 892 F.3d at 1303. It is a mistake to sever the issues when looking at the claim of infringement.[14] Whether the LCS program employed technology that infringed upon FastShip's patents was the primary question of this case. If the court had found that LCS-3 did infringe, it would only add to *damages*. Put differently, FastShip had one core claim regarding infringement by the government. If it prevailed on this claim, it would receive compensation. How much compensation FastShip would receive ultimately depended on how many ships the court found to be infringing. Thus, the thrust of the claim was for infringement, with damages branching from this central issue. As in *Hitkansut*, FastShip's award for attorneys' fees and costs should not be reduced because it was unsuccessful on a subsidary aspect of its claim. *See Hitkansut*, 142 Fed. Cl. at 364 (finding that even though Hitkansut was not successful with regard to a royalty issue that reduced its award by "95%," it did not matter with regards to attorneys' fees because "infringement represented the primary issue.").

2. *FastShip's computational analysis.*

The government next argues that FastShip should not receive any fees for its work related to a computational analysis performed by "experts [] in Sweden." Def.'s Resp. at 33. The computational analysis at issue concerned the hydrodynamic properties of the hull of the LCS. According to the government, FastShip claims "$349,292.50 in fees and expenses related to [the experts'] failed work," but that the work of the experts in Sweden "was never disclosed, cited, or relied on by FastShip [and] accordingly, it was not a necessary expense." *Id.*

---

[14]In its complaint, FastShip filed one count of infringement with the court. *See* Compl. ¶¶ 16-18.

FastShip contests the government's characterization of the work performed by the experts in Sweden. FastShip argues that although the work of the Swedish experts was not used directly during trial, it nevertheless was "critical to FastShip in understanding the limitations of computational fluid dynamics (CFD) to model and compute the hydrodynamic properties of large naval vessels such as LCS-1." Pl.'s Reply at 17. This limitation demonstrated to FastShip that "full scale CFD was not possible, and scale mode CFD was too erroneous." *Id.* This allowed FastShip to make a "strategic decision" regarding CFD data and also to determine that the government's expert, Dr. Stern, had numerous "errors [in his analysis that] were in the [g]overnment's favor." *Id.* at 18.

The court agrees with FastShip. The analysis performed by the experts in Sweden with respect to CFD was an integral foundation for rebutting the government's non-infringement case. Although the report was not used at trial, *see FastShip III*, 131 Fed. Cl. 592, it was referenced by Dr. Garwin, an expert testifying on FastShip's behalf, Pl.'s Br. at 17 (citing Trial Tr. 2311:23 to 2313:14), and was crucial in FastShip's infringement case. The government's assertion that the CFD data was "not a necessary expense," Def.'s Resp. at 33, is counter to the evidence, as it was that very evidence that helped FastShip rebut the government's primary infringement expert. Thus, there is no basis to exclude the CFD analysis from FastShip's fee award.

### 3. *FastShip's cross-appeal to the Federal Circuit.*

The government also argues that FastShip should not receive any fees for its work related to its cross-appeal to the Federal Circuit. Def.'s Resp. at 33-34. The government, in their brief, argues that FastShip "turns the standard for this motion on its head" and that the standard is "whether they succeeded and to what degree they succeeded." *Id.* at 33. Further, the government avers that "the entitlement to fees and costs ends when a judgment is entered. There is no right to further fees unless judgment was reversed or vacated on appeal." *Id.* at 34.

FastShip counters that the government's portrayal of the appeal "ignores the overall outcome." Pl.'s Reply at 18. It argues that the "Federal Circuit affirmed the judgment of this [c]ourt in all respects, except it increased the damages calculation in favor of FastShip." *Id.* (emphasis removed). And, "FastShip should be entitled to its fees incurred for the appeal, [because] it resulted in FastShip prevailing beyond the judgment originally entered by this [c]ourt." *Id.*

Both sides overstate their success at the appellate level. FastShip is correct that their damages were increased. But this was only due to a transcription error at the trial level and was not a substantive change. *See FastShip IV*, 892 F.3d at 1310. On the other side, the government was successful in having the summary judgment regarding the LCS-3 affirmed, but the finding of infringement at trial was also affirmed. Thus, both sides could claim victory from the appellate court's decision.

Regardless, the court agrees that FastShip is entitled to fees. "[A] fee award presumptively encompasses all aspects of the civil action" and "favors treating a case as an inclusive whole." *Jean*, 496 U.S. at 161-62.

### 4. *Document production from General Dynamics and Austral.*

The government further argues that "FastShip's motion to compel production of [General Dynamics]/Austral documents and to pursue sanctions were dismissed as moot . . . [, and] FastShip should not be awarded attorneys' fees . . . associated with these third party subpoenas." Def.'s Resp. at 34.   FastShip counters that these motions "were necessary when made [because] General Dynamics and Austral were not conventional third parties to this case, but contractors to the [g]overnment that possessed relevant information." Pl.'s Reply at 19.  FastShip further represents that these subpoenas were necessary because the government "represented it did not have copies" of the requested documents.  *Id.*

The court agrees with FastShip.  The government is correct that the motion was denied as moot.  *See* Order of July 8, 2014, ECF No. 59.  But the motion was denied as moot because the parties were able to reach an agreement regarding production under the subpoena and the scope of the subpoena.  Hr'g Tr. 4:20 to 5:8 (June 18, 2014).  It is likely due to the effect of the subpoena, or the motion to compel, that brought the two parties together to reach an agreement that did not require the court's intervention.  Further, FastShip was only required to issue the subpoena to third-party Austral due to the government's insistence that it did not possess the documents at issue.  Therefore, the government's attempt to peel off this component of the litigation, either because it was denied as moot or because it involved third parties, is unpersuasive.

     *5.   Unrelated cases.*

The government also argues that FastShip's request for attorneys' fees "includes billing entries that appear to be associated with other cases." Def.'s Resp. at 35.  FastShip, in their reply, contends that the amounts identified by the government total "$5,360.00, and are relatively *de minimis*." Pl.'s Reply at 20.  Either way, FastShip withdraws its request related to the fees identified by the government, *id.* and accordingly, the court will not include them in its consideration.

     *6.   Preparing the present motions.*

The government finally argues that FastShip "may be entitled" for fees for preparing the instant motion, but that any award "should be reduced in proportion to the degree of success achieved." Def.'s Resp. at 45-46.  FastShip, however, is entitled to recover "all reasonably incurred fees." *Hitkansut*, 142 Fed. Cl. at 360 (citing *Jean*, 496 U.S. at 156, 161-62).  This includes fees for the present motion, assuming they are reasonable.  The court will examine the fees requested and rates charged to determine if they reasonable.

B.  *Whether FastShip's Requested Attorneys' Fees And Expert Witness Fees Should Be Reduced*

The court has determined that FastShip is entitled to fees for the entirety of the litigation. Thus, the court's task is to now determine what *amount* of fees are reasonable.

     *1.   Whether FastShip's degree of success should reduce the requested fees.*

The government argues that the court should "apportion the fee award to account for the degree of success achieved by the plaintiff during individual phases of the dispute, or on specific issues during the litigation." Def.'s Resp. at 43-45 (citing *Gargoyles, Inc. v. United States*, 45 Fed. Cl. 139, 147 n.8 (1999) (in turn citing *Community Heating & Plumbing Co., Inc. v. Garrett*, 2 F.3d 1143, 1146 (Fed. Cir. 1993)). In this case, the government contends that the award from the court at trial, $7.4 million, "is the primary factor in evaluating the degree of success that was achieved in this litigation." *Id.* at 44.[15] And, because FastShip sought damages that were much higher than the ultimate award, *i.e.*, because it "alleged that damages for the LCS-1 alone were $44 million," FastShip ultimately achieved a limited amount of success, which should reduce its fees accordingly. *Id.*[16]

FastShip counters that "cost apportionment" does not make sense in this case, as "there is no basis to apportion amount that had to be incurred 'regardless of how many ships' would be manufactured." Pl.'s Reply at 28-33. FastShip also avers that it "achieved excellent results," *id.* at 29, because it was successful in showing "the LCS class of ships infringed the asserted patents" and "recovered millions of dollars as compensation," *id.* at 32. FastShip also argues that "the [g]overnment's argument incorrectly assumes that multiple claims were litigated," but that in this case, "FastShip asserted a single count," upon which it prevailed at trial. *Id.* at 32.

The court rejected a similar argument advanced by the government in *Hitkansut*. 142 Fed. Cl. at 363-64. In *Hitkansut*, the eventual award was reduced by 95% from what the plaintiff originally sought. *Id.* The court, however, refused to reduce the award for attorneys' fees by 95% because damages "did not represent 95% of the case. Rather, infringement represented the primary issue." *Id.* at 364. Like the current case, the only claim brought by Hitkansut was for infringement – a claim upon which it prevailed. *Id.*

Further, not only is the government's approach legally incorrect, it presents practical difficulties. *See Hubbard v. United States*, 480 F.3d 1327, 1334 (Fed. Cir. 2007) (rejecting a "mechanical" approach, in favor of a "nuanced approach."). While the government asserts that "FastShip's attorneys' and expert witness fees should be adjust[ed] in accordance with the degree of success achieved," it does not provide the court with a number or percentage that would allow for this adjustment. Def.'s Resp. at 45. The court would thus be arbitrarily choosing a denominator that it views as appropriate. The government's approach could also discourage attorneys from bringing viable claims to their full extent, defeating the purpose of 28 U.S.C. § 1498(a).

   *2. Whether an award of attorneys' fees and related expenses creates a windfall.*

The government also contends that the any award of attorneys' fees to FastShip will "compensate counsel twice for the same work," Def.'s Resp. at 38, because of the contingent fee arrangement originally agreed by FastShip with Dentons. *Id.* FastShip counters that the

---

[15]As noted, supra, at 1, FastShip's recovery for the infringement was actually $12.36 million, taking into account delay damages.

[16]The government alleges that "[a]t best FastShip succeeded in proving only half of its claims . . . , and perhaps as little as one-sixth of the claims it asserted." Def.'s Resp. at 45.

government's contentions are belied by FastShip's "Supplemental Agreement," that specifies that "any fee award to FastShip based on the [present motions] shall be paid to FastShip and that FastShip shall make payments to Dentons only after FastShip has fully deducted the fees that FastShip has already paid to Dentons." Pl.'s Reply at 22-23.

The court agrees with FastShip. The Supplemental Agreement provided with FastShip's reply, *see* Pl.'s Reply Ex. B, at 2-3, makes evident that any fee awarded to FastShip and paid to Dentons will be net of any fees or contingency payments already made. The court is satisfied the Supplemental Agreement ensures that no double payment or windfall will go to Dentons for any award of attorneys' fees and costs.

   *3. What amount of fees are reasonable.*

FastShip requests a total of $6,988,906.80 in attorneys' fees and related expenses for the work performed on the entirety of the litigation. *See* Pl.'s Resp. at 1 & Ex. B at 2. In total, FastShip's records indicate they expended 11,985.40 hours from 2012 through 2018. *Id.* A total of 41 individuals worked and charged hours on the case over the six years of litigation. *See id.* Ex. B at 2.[17] The two highest billers were the attorney of record for FastShip, Mr. Mark L. Hogge, who billed 2,303.70 hours, and Mr. Rajesh C. Noronha, Senior Managing Associate, who billed 3,175.10 hours. *Id.* Mr. Hogge graduated from law school in 1984 and is currently the "chair of Dentons' legacy Patent Litigation practice." Pl.'s Br. at 34. He has over 30 years of intellectual property litigation experience, and FastShip represents that he has experience "in all the tribunals where IP is likely to be litigated." *Id.* Throughout the litigation, FastShip represents that Mr. Hogge charged an average rate of $835. Pl.'s Resp. Ex. B at 2. Mr. Noronha graduated from law school in 2005 and has 14 years of intellectual property experience. Pl.'s Br. at 35. FastShip represents that Mr. Noronha is a patent litigator in Dentons' "Intellectual Property and Technology group" and has litigated intellectual property cases before a variety of courts. *Id.* Throughout the litigation, FastShip represents that Mr. Noronha charged an average rate of $669. Pl.'s Resp. Ex. B at 2.

Other major billers include: Sharon M. Norwood, Paralegal, who billed 1,132.10 hours at a $266 average rate; Shailendra K. Maheshwari, Partner, who billed 1,021.50 hours at a $585 average rate; Carl P. Bretscher, Counsel, who billed 1,014.70 hours at a $643 average rate; Cheryl M. Bednarz, Paralegal, who billed 832.50 hours at a $318 average rate; and Thomas R. Millar, associate, who billed 566.10 hours at a $472 average rate. Pl.'s Resp. Ex. B at 2.

The statute expressly permits recovery of "reasonable fees for . . . attorneys." 28 U.S.C. § 1498(a). The "most useful starting point . . . is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hubbard*, 480 F.3d at 1332 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). A reasonable rate is one "adequate to attract competent counsel" while avoiding "windfalls to attorneys." *Biery v. United States*, 818 F.3d 704, 710 (Fed. Cir. 2016) (quoting *Hensley*, 461 U.S. at 444). Reasonable attorneys' fees for all stages of the litigation are recoverable. *E.g.*, *Jean*, 496 U.S. at 156, 161-62 ("[A] fee award

---

[17]The titles of these individuals range from the traditional "Partner" and "Associate" to also include a "Supervisor Discovery Technology Services."

presumptively encompasses all aspects of the civil action."). With these starting points, the court "must then consider [several factors regarding] whether to increase or decrease the fee, of which 'the most critical factor is the degree of success obtained.'" *Hubbard*, 480 F.3d at 1332 (quoting *Hensley*, 461 U.S. at 436). In *Hitkansut*, the court found that these standards applied to fee-shifting provisions of the Civil Rights Act, EAJA, and the Uniform Relocation Act, 142 Fed. Cl. at 361-62 (citing *Hubbard*, 480 F.3d at 1333 (discussing the Civil Rights Act and EAJA); *Biery*, 818 F.3d at 712 (Uniform Relocation Act); *Lost Tree*, 135 Fed. Cl. at 96 (Uniform Relocation Act)), and it ruled that this approach should apply to fees sought under 28 U.S.C.§ 1498(a) as well, *id.*

A number of different indices exist for determining the reasonable hourly rate for attorneys' fees under fee-shifting statutes. Plaintiff provides excerpts of the American Intellectual Property Law Association's 2017 Report of the Economic Survey ("AIPLA Survey"), *see* PX 10. The AIPLA's Economic Survey is the most recent report available that summarizes attorneys' fees in intellectual property litigation, broken down by geographic location, levels of experience, and other categories. *See* AIPLA Survey; *see also Hitkansut*, 142 Fed. Cl. at 347. Another index is the Adjusted Laffey Matrix (also provided by plaintiff), a chart developed by the United States Attorney's Office.[18] An alternative to the Adjusted Laffey Matrix is the "Kavanaugh Matrix."[19] The Federal Circuit provides this court with significant discretion in determining the reasonable rate for attorneys' fees, calling upon the court to "consider all the relevant facts and circumstances," and provide "a concise but clear explanation of its reasons for the fee award." *Biery*, 818 F.3d at 714 (quoting *Hensley*, 461 U.S. at 437). "This includes the decision to use either the Adjusted Laffey Matrix or the Kavanaugh Matrix or any departure, or no departure, from the rates they suggest." *Id.*

---

[18]For an extensive discussion of the genesis and history of the Adjusted Laffey Matrix, *see DL v. District of Columbia*, 924 F.3d 585, 589-90 (D.C. Cir. 2019); *see also Biery*, 818 F.3d at 714. The Adjusted Laffey Matrix is "based on changes to the cost of living in the Washington D.C. metropolitan area as measured by the Consumer Price Index for All Urban Consumers." *Biery*, 818 F.3d at 713 (citations omitted). The Laffey Matrix was developed by the Civil Division of the United States Attorney's Office for the District of Columbia to evaluate requests for attorney's fees in civil cases in District of Columbia courts. *See Laffey Matrix*, United States Department of Justice, https://www.justice.gov/usao-dc/file/796471/download (last accessed June 17, 2019). The stated purpose of the Adjusted Laffey Matrix is "for use in cases in which a fee-shifting statute permits the prevailing party to recover 'reasonable' attorney's fees." *Laffey Matrix* n.1.

[19]The Kavanaugh Matrix, named after its economist creator, Dr. Michael Kavanaugh, "makes adjustments to the Laffey Matrix based on changes to the Legal Services Index [] component of the Consumer Price Index . . . to provide adjustments that solely capture the market for legal services." *Biery*, 818 F.3d at 713.

In *DL*, the D.C. Circuit ruled that the new Kavanaugh Matrix "based on data for all types of lawyers–not just those who litigate complex federal cases–from the entire metropolitan area–not just the District of Columbia," had been inappropriately applied in a complex litigation in the District Court for the District of Columbia. *DL*, 924 F.3d at 587-88, 591-92.

In this case, the primary legal market is Washington, D.C.  All of the attorneys and support staff identified by FastShip in their brief were located in the D.C. area.  *See* Pl.'s Br. at 33-38.  While the Adjusted Laffey Matrix is a useful tool for determining attorneys' fees, the court believes, as it did in *Hitkansut*, that the AIPLA Survey provides the most relevant starting point in this case.  *Hitkansut*, 142 Fed. Cl. at 361.  The AIPLA 2017 Survey provides the most recent attorney fee data particular to intellectual property litigation, a specialized field that specifically applies to this case.   Further, the AIPLA Survey allows for the same geographic narrowing that the Adjusted Laffey Matrix provides.

For partners in the Washington, D.C. area, the AIPLA Survey provides an average hourly rate of $535, a median of $470, a third quartile of $681, and a 90th percentile of $818.  AIPLA Survey at I-27.  For associates in the Washington, D.C. area, the AIPLA Survey provides an average of $452, a median of $400, a third quartile of $555, and a 90th percentile of $700.  *Id.* at I-39.  Here, the court believes the rates in the third quartile from the AIPLA 2017 Survey provide a reasonable compensation base that is "adequate to attract competent counsel," but also avoids providing a "windfall" to FastShip.  *Biery*, 818 F.3d at 710 (quoting *Hensley*, 461 U.S. at 444); *see also Hitkansut*, 142 Fed. Cl. at 362 (finding the third quartile to be "appropriate to attract counsel competent to handle highly-technical patent litigation against the resources of the federal government.").  As FastShip's counsel obtained success against the government in this difficult litigation, the court believes using the third quartile number for both associates and partners is appropriate.  Both of the relevant rates, $681 for partners and $555 for associates, are well above the number suggested by the Adjusted Laffey Matrix.

The court finds that the AIPLA Survey third quartile hourly rate of $681 is reasonable for Mr. Hogge, given his patent litigation experience.  Although this number is lower than the average hourly rate of $835 requested by FastShip for the services of Mr. Hogge, the court believes it satisfies the purpose of the statute.  Thus, the court awards FastShip $1,568,819.70 in fees for the work of Mr. Hogge.  *See* Pl.'s Resp. Ex. B at 2.[20]   The court further finds that the AIPLA third quartile hourly rate of $555 is reasonable for Mr. Noronha, also considering his patent litigation experience and heavy role in terms of hours worked.  Again, while this number is lower than the average hourly rate of $669 requested by FastShip for the work of Mr. Noronha, the court believes it provides reasonable compensation to attract competent counsel.  The court therefore awards FastShip $1,762,180.50 for the services of Mr. Noronha.[21]

FastShip also bills for several individuals who contributed significant hours to the litigation, albeit at levels below Mr. Hogge and Mr. Noronha.  *See* Pl.'s Br. at 34-38; *see also* Pl.'s Resp. Ex. B at 2. These individuals are Gary D. Mangels, a Senior Managing Associate who billed 385.10 hours at a $535 rate, for a total bill of $206,009.68; James F. Wiley, Jr., Associate, who billed 214.50 hours at a $495 rate, for a total bill of $106,168.49; Matthew P. Larson,

---

[20]FastShip represents that Mr. Hogge worked 2,303.70 hours on the litigation.  Pl.'s Resp. Ex. B at 2.  This number multiplied by the $681 third quartile hourly rate equals $1,568,819.70.

[21]FastShip rerepsents that Mr. Noronha worked 3,175.10 hours on the litigation.  Pl.'s Resp. Ex. B at 2.  This number multiplied by the $555 AIPLA third quartile hourly rate equals $1,762,180.50.

Associate, who billed 340.60 hours at a $420 rate, for a total bill of $143,052.00; Nicholas H. Jackson, Partner, who billed 247.10 hours at a $451 rate, for a total bill of $111,352.50;[22] Shailendra K. Maheshwari, Partner, who billed 1,021.50 hours at a $585 rate, for a total bill of $597,344.02; and Thomas R. Millar, Associate, who billed 566.10 hours at a $472 rate, for a total bill of $267,280.00.  These individuals are billed at rates lower than the AIPLA Survey numbers adopted by the court, and the court also is satisfied with the justification provided by Fastship.  The court consequently awards these fees as requested.  Thus, the court awards FastShip $1,431,206.69 in attorneys' fees for the services of Mr. Wiley, Mr. Larson, Mr. Jackson, Mr. Mangels, Mr. Maheshwari, and Mr. Millar.

There is, however, one individual who billed significant time to the matter whose participation is not fully supported by FastShip: Mr. Carl P. Bretscher, Counsel.  *See* Pl.'s Br. at 34-38 (no mention of Mr. Carl P. Bretscher); Pl.'s Reply at 19-20 (same).  Mr. Bretscher billed 1,014.70 hours on the litigation at a $643 hourly rate, for a total bill of $652,729.50.  Pl.'s Resp. Ex. B at 2.  While the rate charged by Mr. Bretscher is below the AIPLA third quartile number of $681 for a partner, the court believes his rate should also be adjusted downward due to the lack of detail on his background, although he did conduct direct examination of witnesses at trial during several days.  Consequently, the court will award the hours worked by Mr. Bretscher at 60 percent of the requested amount.  Thus, FastShip is awarded $391,637.70 for the work performed by Mr. Bretscher.

FastShip also requests fees for several individuals, ranging from associates to partners and counsels, who each billed less than 75 hours, most less than 30.  *See* Pl.'s Resp. Ex. B at 2. A review of the entries detail that these individuals, with three exceptions, each billed at an average rate below the AIPLA third quartile, whether they were partners or associates.  The court therefore awards each of these fees as requested, for a total of $97,723.41.[23]  The exceptions, however, are Mr. Kirk R. Ruthenberg, a partner who billed 36.60 hours with an hourly rate of $995 for a total of $36,417; Mr. Charles R. Bruton, a counsel who billed 8.00 hours with an hourly rate of $740, for a total of $5,920; and Derek A. Auito, a senior managing associate who billed 4.30 hours with an hourly rate of $625, for a total of $2,687.50.  *See id.*  As FastShip does not provide any details that would justify Mr. Ruthenberg's, Mr. Bruton's, or Mr. Auito's high billing rates, the court will accordingly adjust their rates downwards to the AIPLA survey rate of $681 per hour for Mr. Ruthenberg and Mr. Bruton, and $555 for Mr. Auito.  Thus, the court

---

[22]Mr. Jackson's lower rate reflects the fact that he primarily served as an associate attorney on the case during discovery.  Pl.'s Br. at 37.

[23]Claire E. Bornstein, Managing Associate, 1.20 hours, $395 rate, $474.00 total bill; Daniel Morris, Senior Managing Associate, 52.40 hours, $550 rate, $28,820.00 total bill; Jason M. Silverman, Partner, 0.60 hours, $625 rate, $375.00 total bill; Jessica A. Rebarber, Managing Associate, 0.90 hours, $395 rate, $355.50 total bill; Leslie A. Barry, Managing Associate, 73.50 hours, $399 rate, $29,348.78 total bill; Michael E. Zolandz, Partner, 9.00 hours, $648 rate, $5,829.00 total bill; Nathan P. Sportel, Associate, 5.50 hours, $230 rate, $1,265.00 total bill; Peter G. Feldman, Partner, 24.40 hours, $578 rate, $14,097.00 total bill; Robert M. Holland, Associate, 38 hours, $335 rate, $12,729.63 total bill; Shannon L. Smith, Counsel, 1.50 hours, $425 rate; $637.50 total bill; Ying-Hua B. Sun, Associate, 9.60 hours, $395 rate, $3,792.00 total bill.

awards FastShip $24,924.60 for the work of Mr. Ruthenberg, $5,448 for the work of Mr. Bruton, and $2,386.50 for Mr. Auito.

As for support staff and paralegals, FastShip asks for an approximate average rate of $292 across all support categories. *See* Pl.'s Resp. Ex. B at 2. The AIPLA Survey does not include information for paralegals and support staff. Therefore, the court will use the Adjusted Laffey Matrix as a starting point. The Adjusted Laffey Matrix for 2015-2019 lists the reasonable hourly rate for support staff and paralegals at $154, $157, $164, and $166, respectively. *Laffey Matrix* at 1. In *Hitkansut*, a litigation of similar scope and complexity, the court found $150 to be appropriate for paralegals and support staff. 142 Fed. Cl. at 363. But the work in *Hitkansut* was performed in Detroit, Michigan, a less expensive market than Washington, D.C. *Id.* The court will therefore adjust this number upwards to reflect the difference in market. The court will further adjust the number upwards from the Adjusted Laffey Index to reflect the technical nature of patent litigation and the experience of the identified and explained support staff. *See* Pl.'s Br. at 37-38. Thus, the court believes an average rate of $175 is appropriate compensation for paralegals and support staff.

As FastShip includes billing details for several individuals with non-traditional titles[24] but does not provide any details about their backgrounds or their roles in this litigation beyond their title, the court will consider these individuals to be "support staff" and billed at the $175 rate. Using the summaries provided by FastShip, *see* Pl.'s Resp. Ex. B at 2, the court calculates that support staff billed 2,451.50 hours on the FastShip matter.[25] This number, multiplied by the $175 rate for support staff, equates to $429,012.50 of attorneys' fees and related expenses for FastShip's support staff.

In sum, the court awards FastShip $5,713,339.60 for attorneys' fees.

### 4.   Expert witness fees.

As a preliminary matter, "[r]easonable and entire compensation . . . includ[es] reasonable fees for expert witnesses." 28 U.S.C. § 1498(a). Fees for experts are considered to be

---

[24]Such staff include, *e.g.*, Mr. Hilliard T. Moore, Jr., a "Discovery Engineer" who billed 4.80 hours and charged a $308 average hourly rate.

[25]This number is the sum of all of the non-attorney members of the FastShip litigation team and includes: Allie Bernado, Administrative, 2.10 hours; Angela M. King, Paralegal, 3.00 hours; Cheryl M. Bednarz, Paralegal, 832.50 hours; Craig S. Everly, Paralegal, 138.20 hours; Debra L. Atkins, Policy Research Director, 7.50 hours; Derek J. Boor, Supervisor Discovery Technology Services, 4.00 hours; Hilliard T. Moore, Jr., Discovery Engineer, 4.80 hours; Jaye Lapachet, Administrative, 23.50 hours; Jeffrey M. Hanson, Paralegal, 10.40 hours; Karen H. Johnson, Paralegal, 220.80 hours; Kristine M. Lieurance, Discovery Project Manager, 0.40 hours; Lidija Pegan-Knight, Paralegal, 4.10 hours; Marine A. Ratner, Administrative, 0.30 hours; Mary K. Ciziunas, Research Specialist, 3.60 hours; Mary R. Smyth, Paralegal, 12.50 hours; Rubert Ellison, Jr., Discovery Analyst, 49.30 hours; Ryan Aldrich, Discovery Project Manager, 2.40 hours; Sharon M. Norwood, Paralegal, 1132.10 hours.

presumptively reasonable if they were incurred in an arm's length transaction. *See, e.g.*, *Hitkansut*, 142 Fed. Cl. at 365 (citing *Lost Tree*, 135 Fed. Cl. at 96 (in turn citing *Florida Rock Indus., Inc. v. United States*, 9 Cl. Ct. 285, 290 (1985) ("Fees incurred and paid by a client at an agreed rate are presumptively reasonable."))). FastShip requests fees related to the services of four expert witnesses, three of whom testified at trial. The government opposes some of the proposed fees for certain experts, most notably those fees requested for Ms. Krista Holt, FastShip's damages expert.

### (a) Dr. Richard Garwin.

FastShip asks for fees and expenses related to the testimony of Dr. Richard Garwin. Pl.'s Br. at 46-47. In its original brief, FastShip asked for $180,610.66 in fees related to Dr. Garwin, *id.*, but later increased the amount to $196,264.75 via a supplemental fee request, *see* Pl.'s Suppl. Mem. at 1; *see also* PX RR. The government opposes the fees and expenses related to Dr. Garwin "because FastShip did not comply with the requirement that Dr. Garwin's rates be identified at the time of his expert report and the invoices and related documentation were not timely filed with this application." Def.'s Resp. at 41. The government's argument is essentially a technical one, *i.e.*, that because FastShip did not "timely file[]" his invoices and related documentation or provide his rates at the time of his expert report, it is not entitled to fees for his services. *Id.* The government does not substantively object to any other aspects of the fees requested for Dr. Garwin, *i.e.*, the rates charged or the hours worked. *See id.*

The court finds the fees requested for Dr. Garwin to be reasonable, as the government's form-over-substance argument is not persuasive. At trial, the court admitted Dr. Garwin as an expert in fluid dynamics and accepted his expert report into evidence. *See FastShip III*, 131 Fed. Cl. at 613 n.23.[26] Further, Dr. Garwin's testimony at trial was integral to FastShip proving infringement. *See id.* at 613-17. His testimony directly contradicted the government's expert, Dr. Stern, while exposing several significant errors in Dr. Stern's analysis that ultimately led the court to "accord[] little weight" to Dr. Stern's testimony and expert report. *Id.* As for the government's arguments, Dr. Garwin testified at his deposition that his hourly rate was $375. *See* Pl.'s Reply Br. at 26 (citing *id*. Ex. 5, Dep. Tr. of Dr. Richard Garwin at 84:6 to 85:9). In addition, FastShip rectified their original omission by providing the invoices for Dr. Garwin's services. *See* Pl.'s Suppl. Mem.; PX RR. Thus, the court awards FastShip the requested $196,264.75 in fees incurred for the services of the expert witness Dr. Richard Garwin.

### (b) Dr. Chris McKesson.

FastShip requests $42,929.94 in fees and expenses related to the expert witness Dr. Chris McKesson. *See* Pl.'s Br. at 47-48; *see also* PX LL. At trial, the court accepted Dr. McKesson as an expert in "naval architecture, including waterjet propulsion. *FastShip III*, 131 Fed. Cl. at 611 n.19. And, like Dr. Garwn, his expert report was accepted into evidence. *Id.* The government does "not object to the fees and expenses sought for Dr. McKesson." Def.'s Resp. at 40-41.

---

[26]Dr. Garwin is an eminent physicist who is a named inventor on 50 United States patents and has published dozens of articles in various fields related to physics. He received the National Medal for Science in 2002, La Grande Médaille de l'Académie des Sciences from France, and the National Medal of Freedom in 2016.

Even so, much like Dr. Garwin, Dr. McKesson's testimony was integral to FastShip's case at trial.  *See FastShip III*, 131 Fed. Cl. at 611-17.  Therefore, the court agrees with the parties respecting the fees sought for Dr. McKesson and awards FastShip $42,929.94 in expert witness fees and expenses for his services.

(c) *Ms. Krista Holt.*

FastShip requests $1,505,027.82 in fees and expenses for the services of Ms. Krista Holt and her team at GreatBridge Consulting.  Pl.'s Br. at 48-49; *see also* PX HH.[27]  Ms. Holt served as the damages expert for FastShip in this case, Pl.'s Br. at 48, and was accepted by the court as an expert in "patent damages valuation," *FastShip III*, 131 Fed. Cl. at 623 n.33 (citing Trial Tr. 1151:2-4).  Her expert reports were admitted into evidence.  *Id.*

The government opposes the award to Ms. Holt for a variety of reasons.  *See* Def.'s Resp. at 41-43.  It contends that the invoices provided by Ms. Holt's company, GreatBridge Consulting, are "very general," and

> [t]here is no way to determine which individual performed which 'activities,' nor is there any way to correlate which cost entries are associated with review or analysis of particular documents. . . .  Ms. Holt's expert reports indicate she considered at least 250,000 pages of documents in this case, including far more technical documents than either Dr. McKesson or Dr. Garwin.

*Id.* at 42.  The government also takes issue with the size of the amount requested for Ms. Holt, which is "nearly six times the amount expended for FastShip's two infringement experts combined."  *Id.* at 43.  The government further argues that Ms. Holt's testimony was largely ignored by this court.  *See id.* at 42-43.  In sum, the government requests that the fees to Ms. Holt be reduced by the "degree of success achieved in the damages award, *i.e.*, 7/44 (16%)."  *Id.* at 43.

The court is concerned by the amount of fees charged by Ms. Holt.  There is, as the government notes, a significant imbalance between the costs charged by each of the experts. Approximately $1.5 million of a total of $1.7 million in requested expenses for expert witnesses relates to Ms. Holt.  But Ms. Holt was an expert for damages.  She did not testify with respect to the primary issue of infringement.  It is not apparent how Ms. Holt was able to accumulate nearly $1.5 million in fees when testifying to a secondary issue.  Further, a review of the invoices for Ms. Holt provided by FastShip in support of their request shows little detail.  Descriptions of the work performed are vague, generalized, and non-specific.  *See, e.g.*, PX HH at 6-7.  For example, the invoice covering March 8, 2013 to April 30, 2013, totaling $24,436.25, reportedly provides a "summary of the activities performed" but provides only minimal detail about what work was actually done: "[r]esearch, [s]ummary of research, [a]ssistance with discovery, [d]ata analysis, [c]onference calls with [c]ounsel/[c]lient, [j]ob [a]dministration."  *Id.* at 6-7.  The other invoices

---

[27]The total of the invoices, less discounts and other credits, equals $1,507,943.32. FastShip may have double-counted a $2,915 credit.  See PX HH at 146, 148.  FastShip also did not include the July 2017 invoice.  *See* PX 2-B at 22.  The court begins, however, with the amount requested by FastShip.

contain descriptions using identical or similarly vague terms. *See, e.g.*, PX HH at 67. Although the invoices do break down the hours charged by individual and their position at GreatBridge, they do not provide detail on what work was actually performed by each individual, how many hours were spent on particular tasks, or why that individual was qualified to bill at a particular rate. *See, e.g.*, PX HH at 106-07.

The court also has concerns about the amount and duration of Ms. Holt's work. Ms. Holt, despite testifying to the secondary issue of damages, first billed Dentons for work beginning on March 8, 2013. PX HH at 2. Invoices continued on a near-monthly basis until July of 2017 – after the court issued its opinion on infringement and damages on April 28, 2017 – for largely the same services: "[r]esearch, [r]eview documents, [c]onference calls with [c]ounsel/[c]lient, [j]ob [a]dministration." PX HH at 151-52.[28] The invoices average $55,661.79, with a median amount of $27,392.50 and a high of $176,387.50 for June 2015 and a low of $287.50 for February 2017. *See* PX HH at 80 (high), 144 (low). In total, Ms. Holt and GreatBridge Consulting accumulated more than 6,500 hours on the FastShip engagement. *See* PX HH. One month, July 2015, saw Ms. Holt and 11 other GreatBridge employees bill 794.75 hours to the FastShip engagement. PX HH at 86. The description for work performed for that month lists tasks such as "[c]reation of [w]orksheets," among other equally vague terms. PX HH at 87. It is also not apparent why Ms. Holt, who has a bachelor's degree in psychology and a master's degree in business administration, charges $425.00 per hour, especially when compared to FastShips' other two experts who both have PhDs, were eminently qualified, and charged considerably less.[29] In this case, the heavy lifting was on proving infringement of FastShip's patent by the government, a topic which was covered by Dr. Garwin and Dr. McKesson.

The sheer number of hours worked by Ms. Holt's firm (6,564.75), whose ultimate contribution to this case was the 3% royalty rate the court used for its damage calculation (which itself was based on two of FastShip's prior licenses), *see FastShip III*, 131 Fed. Cl. at 623, is unexplained. The court found Ms. Holt's testimony with regards to the reasonable compensation base to be against established precedent in patent law. *Id.* at 625-26 ("Ms. Holt's approach to include the value of the *entire ship* as the royalty base, only excluding the cost of weapons, is inappropriate.") (emphasis added). For comparison, Dentons spent 11,985.40 hours total in litigating the *entire case*. *See* Pl.'s Resp. Ex. A at 5.

This court has held on numerous occasions that expert witness fees may be reduced for lack of detail. *See Raymo v. Secretary of Health & Human Servs.*, 129 Fed. Cl. 691, 704-05 (2016) ("[P]etitioners must provide 'reasonably specific documentation' to support the costs requested."); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 100 Fed. Cl. 750, 766-67 (2011) (finding that due to lack of documentation, "the court [was] unable to

---

[28]Ms. Holt charged Dentons $4,787.50 (after the application of an unexplained discount) for work performed from March to June 2017. While the invoice does not describe when the work was done, nothing in the case occurred between oral argument on February 21, 2017 and entry the opinion on April 28, 2017, except for a motion to modify a Protective Order. What Ms. Holt was researching at this late date is unexplained.

[29]Dr. Garwin, for example, charged $375 per hour, and Dr. McKesson charged $125 per hour.

determine whether the cost of the appraisals was reasonable, the court declines to made an award.") (citing *Cobell v. Norton*, 407 F. Supp. 2d 140, 163 (D.D.C. 2005) (finding that because certain time entries were "inadequately documented [] it [was] impossible for the [c]ourt to determine with a high degree of certainty that such hours were actually and reasonably expended.") (citation omitted)).  The Supreme Court has specifically noted the problems inadequate time records pose.  *See Hensley* (finding an award of attorneys' fees under 42 U.S.C. § 1988 requires that "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.  The applicant should exercise 'billing judgment' with respect to hours worked, and should maintain billing time records."); *see also White v. City of Richmond*, 713 F.2d 458, 460-61 (9th Cir. 1983) ("[A] [d]istrict [c]ourt should not award attorneys' fees unless the prevailing party presents sufficiently detailed records that the time expended and the need for the services are clearly established.") (disapproved on other grounds by *Pennsylvania v. Delaware Valley Citizens' Council for Clear Air*, 483 U.S. 711 (1987)).

Here, the court finds that the hours and time expended by Ms. Holt and her team are not justified by the work documented or explained.  As noted, the issue of damages was a secondary component to this litigation, and Ms. Holt's testimony was ultimately of modest assistance to the court.  Further, and importantly, the billing invoices by Ms. Holt lack any sort of detail that would allow the court to discern why her team spent over 6,500 hours in performing her analysis.  For example, providing 13 lines of generic work descriptors, such as "[d]ata [e]ntry," for nearly 800 hours of work performed during a single month is insufficient for an application of expert expenses.  FastShip has failed in its burden to provide support that would allow this court, with reasonable certainty, to determine that Ms. Holt's fees and services were reasonably necessary to the case.

The court therefore reduces the fees awarded to FastShip for the services of Ms. Krista Holt by 85%, to a total of $225,754.00.  Even this reduced number is comparable to the combined total fees for FastShip's infringement experts ($239,194.69).  The court believes this reduced number is reasonable compensation for the work performed by Ms. Holt and her contribution to the case.  *Cf. Hitkansut*, 142 Fed. Cl. at 365 (awarding Hitkansut's damage expect $255,000)/

   *(d) Mr. Nicholas Edmiston.*

FastShip finally requests $7,000 in expert fees for the services of Mr. Nicholas Edmiston, "the founder and chairman of Edmiston & Co[.], a company that focuses on the sale, charter, management and construction of yachts."  Pl.'s Br. at 49.  According to FastShip, Mr. Edmiston "served as a non-testifying expert regarding the valuation, sale, and construction of large marine vessels, providing information to testifying expert Krista Holt that assisted her with damages analysis."  *Id.*  The government challenges the $7,000 paid to Mr. Edmiston, noting particularly that FastShip provided has not supporting documentation regarding his participation in the litigation.  Def.'s Resp. at 43.

Mr. Edmiston did not testify at trial.  Nor could FastShip provide invoices about what work Mr. Edmiston performed, despite "working to obtain a copy of the invoices."  Pl.'s Br. at 49.  Instead, FastShip provides a declaration by one of the attorneys on the case, Mr. Stout,

stating that Mr. Edmiston was a "[n]on [t]estifying expert . . . relied upon by Krista Holt." PX 2 at 3. Yet, a declaration alone by one of the counsel is not enough to support an award of fees. The court cannot tell if the fees were negotiated at arm's length, if they were reasonable for the work performed, or any other details about the work of Mr. Edmiston. Indeed, the fact that Mr. Edmiston charged exactly $7,000 in fees and related expenses indicates that counsel is likely rounding. And, according to Mr. Stout's declaration and FastShip's brief, the expert was used in connection with Ms. Holt's testimony, an expense which the court significantly reduced due to concerns about its large size in proportion to the case. *See supra.* Therefore, the court denies the $7,000 fee request by FastShip for the services of Mr. Edmiston.

In sum, the court awards FastShip $464,948.69 in expert witness fees.

## C. Bill of Costs

The court must determine what amount of costs are reasonable and awardable if reasonably related to the case and not otherwise barred. *See* 28 U.S.C. § 1498(a); *Hitkansut*, 142 Fed. Cl. at 366. The court has already determined that the conduct of the government was not reasonably justified during this litigation. Compared with the attorneys' fees and related expenses, FastShip's bill of costs is a relatively simple. FastShip originally claimed $2,430,047.71 in its bill of costs, Pl.'s Cost Br. at 57, but dropped this number to $1,279,735.62 following objections by the government.[30] The government and FastShip agree that the vast majority of the remaining requested costs are reasonable and not specifically barred. *See* Def.'s Objs. at 5-6; Pl.'s Bill of Cost Reply at 3. Both parties agree that $1,096,193.08 of the uncontested costs are recoverable under 28 U.S.C. § 1498.[31] And, both parties agree that a further $133,485.99 of the uncontested costs are reasonable and awardable under both RCFC 54(d) and 28 U.S.C. § 1920.[32]

---

[30]Most of the controversial costs, such as those for FastShip's bankruptcy and living expenses for Mr. David Giles, were dropped by FastShip in their reply. *See* Pl.'s Bill of Cost Reply at 6.

[31]The amount of $1,096,193.08 is composed of $877,000.55 of fees to Summit Global Services, LLC for electronic discovery services, PXs MM, SS; $152,624.69 to A2L for courtroom graphics, PX AA; $5,464.58 to InData Corp. for courtroom graphics, PX JJ; $45,699.97 of fees to M. Bagdon for services as an in-courtroom display operator, PX BB; $5,360.00 in licensing fees to Trial Director Service for electronic evidence displays, PX 4 at 26; $3,455.30 in process server fees, PX EE; $6,361.19 in travel expenses, EX PP; and $226.80 in electronic research costs, PX QQ.

[32]The amount of $133,485.99 is composed of $77,179.18 of costs for certification or duplication, $28,293.67 for fees of the reporter used for all or any part of the trial, $855.00 for fees of the Clerk of the Court of Federal Claims, $1,400.00 for witness fees, and $25,758.14 for costs incidental to the taking of depositions. Def.'s Objs. at 5.

There is some confusion regarding the costs incident to taking depositions that FastShip requests. The government states that it cannot reconcile the $25,758.14 requested by FastShip

The only remaining costs about which the parties disagree, then, are the costs for FastShip's appeal to the Federal Circuit. Pl.'s Bill of Cost Reply at 4-5. FastShip states that it incurred $33,450.30 of expenses on appeal. *Id.* But the decision of the Federal Circuit in affirming the decision of this court explicitly stated that "[e]ach party shall bear its own costs." *See FastShip IV*, 892 F.3d at 1311. As this court has no power to override a decision by the appellate court, it cannot award these fees related to the appeal and sought by FastShip. *See, e.g.*, *Hitkansut*, 142 Fed. Cl. at 366 (citing 28 U.S.C. § 1920(1)-(5); Fed. Cir. R. 39 (Practice Notes)).

There is, however, a discrepancy of $16,606.25 between the costs agreed to by the parties ($1,229,679.07) and the number requested by FastShip with the costs for the appeal to the Federal Circuit removed ($1,279,735.62 - $33,450.30). The government mentioned this amount at the hearing on April 3, 2019, stating that they "could not reconcile" this amount with the numbers of the bill of costs. Hr'g Tr. at 58:8-9. The discrepancy may be costs related to FastShip's preparation of the present motions for attorneys' fees and bill of costs. *See* Pl.'s Cost Br. at 42; Pl.'s Bill of Cost Reply at 5. But FastShip does not provide any details regarding the $16,606.25 difference, nor has FastShip timely filed a supplemental cost application for fees incurred from the original filing of its cost application. Instead, FastShip attempts to reserve the right for "any additional costs and related expenses reasonably incurred from the time this reply is filed." Pl.'s Bill of Cost Reply at 6. Yet at some point the litigation must end. FastShip cannot continue to recover fees *ad infinitum* from each subsequent filing. *See Hitkansut*, 142 Fed. Cl. at 360 (citing *Jean*, 496 U.S. at 163 (warning of a "'nightmare' of infinite litigation to recover fees."); *Bratcher v. United States*, 138 Fed. Cl. 543, 547 (2018)). Therefore, the court awards FastShip $1,229,679.07 in costs.

## CONCLUSION

For the forgoing reasons, FastShip's motion for attorneys' fees and related expenses and bill of costs under 28 U.S.C. § 1498(a) is GRANTED IN PART and DENIED IN PART. FastShip is awarded $6,178,288.29 in attorneys' fees and related expenses. FastShip is also awarded $1,229,679.07 in costs. The Clerk shall therefore enter final judgment for FastShip for a total amount of $7,407,967.36.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge

---

on Form 4 with the specific, itemized costs it requests in its brief. *See* Def.'s Objs. at 5 & n.2. FastShip, in its reply, argues that the government omitted $2,879.65 in costs related to the deposition of Donald Blount on June 2, 2016. *See* Pl.'s Bill of Cost Reply at 3-4. After reviewing the support provided by FastShip, the court concurs with FastShip that the government's error was due to the omission of the $2,879.65 related to Mr. Blount's deposition and will include this number in the final calculation.