# In the United States Court of Federal Claims

No. 12-484C

(Filed Under Seal: March 31, 2021)
(Reissued April 7, 2021)

|  |  |  |
|---|---|---|
| **FASTSHIP, LLC**, | ) | Patent case; prevailing plaintiff's claim |
| | ) | for attorneys' fees and expenses; 28 |
| Plaintiff, | ) | U.S.C. § 1498(a); lack of substantial |
| | ) | justification for government's position; |
| v. | ) | attorneys' fees and expenses |
| | ) | |
| **UNITED STATES**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

     Mark L. Hogge, Dentons US LLP, Washington, D.C. for the plaintiff.  With him on briefs were Rajesh C. Noronha, Dentons US LLP, Washington, D.C. and Donald E. Stout, Fitch, Even, Tabin & Flannery LLP, Washington, D.C.

     Scott Bolden, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C for the United States.  With him on briefs were Jeffrey Bossert Clark, Acting Assistant Attorney General, Civil Division, Gary L. Hausken, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C, and Andrew P. Zager, Department of the Navy, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Senior Judge.

     Pending before the court in this patent case is FastShip, LLC's motion for attorneys' fees and bill of costs.[2]  The court previously found that in constructing a class of littoral combat ships

---

[1] Because of the protective order entered in this case, this opinion was initially filed under seal.  The parties were requested to review this opinion and to submit proposed redactions of any confidential or trade secret material.  No redactions were requested.

[2] This case has been extensively litigated, resulting thus far in six published opinions and orders.  See *FastShip, LLC v. United States*, 114 Fed. Cl. 499 (2013) ("*FastShip I*") (claims construction); *FastShip LLC v. United States*, 122 Fed. Cl. 71 (2015) ("*FastShip II*"); *FastShip, LLC v. United States*, 131 Fed. Cl. 592 (2017) ("*FastShip III*") (ruling on liability and just compensation for infringement), *aff'd*, *FastShip, LLC v. United  States*, 892 F.3d 1298 (Fed Cir. 2018) ("*FastShip IV*"); *FastShip, LLC v. United States*, 143 Fed. Cl. 700 (2019) ("*FastShip V*")

("LCS"), the Navy infringed two patents held by FastShip.  *See FastShip III*, 131 Fed. Cl. at 627-28 (awarding FastShip $6,449,585.82 plus interest for the United States' infringement); *FastShip IV*, 892 F.3d at 1310 (correcting a transcription error, resulting in an award of $7,117,271.82).  Ultimately, FastShip recovered $12.36 million, including interest.  *See FastShip V*, 143 Fed. Cl. at 709.  In 2018, plaintiff initially moved for attorneys' fees and related expenses.  *See* Pl's Mot. for Atty's Fees & Related Expenses, ECF No. 190.  The court granted plaintiff's motion in part and awarded FastShip $7,407,967.36 for attorney's fees and related expenses.  *Id.* at 735.  The government appealed the court's ruling, and the Federal Circuit vacated and remanded.  *FastShip VI*, 968 F.3d at 1336.  FastShip now renews its motion for attorneys' fees and costs.  The court finds that the government's litigating positions were not substantially justified.  Therefore, FastShip's motion is GRANTED IN PART and DENIED IN PART, and the court awards FastShip fees and costs totaling $7,786,601.46.

## BACKGROUND

### A.  Factual Background & Merits Litigation

This case concerns two patents originally issued to David Giles and later assigned to FastShip.  *See* U.S. Patent Nos. 5,080,032 ("the '032 patent") (issued Jan. 14, 1992) and 5,231,946 ("the '946 patent") (issued Aug. 3, 1993).  The patents described the claimed invention as a "monohull fast sealift . . . or semi-planing monohull . . . ship . . . whose hull design in combination with a waterjet propulsion system permits . . . transoceanic transit speeds of up to 40 to 50 knots in high or adverse sea states" for large ships "of about 25,000 to 30,000 tons displacement with a cargo carrying capacity of 5,000 tons."  '032 Patent col. 1, lines. 6-13; '946 Patent col. 1, lines. 10-17.

Beginning in the early 2000s the Navy began "exploring the concept that later became the LCS program[,] seeking new ships that could be used for 'focused missions' at high speeds," and requested proposals for the LCS program in 2003.  *FastShip III*, 131 Fed. Cl. at 600 (internal citation omitted).  The Navy's request did not specify a required hull design.  *See id.*  FastShip engaged with two government contractors involved in the LCS program and signed an agreement that provided for "information sharing between the LCS team and FastShip."  *Id.* at 601-02.  While it was "unlikely" that the parties would enter into a direct arrangement concerning hull design, FastShip could be added "to the team for certain design aspects" of the project.  *Id.* at 601 (internal quotation marks and citation omitted).  Despite this understanding, FastShip was not involved in the design of the ship during the procurement or construction process.  *See id.* at 602-03.  The first of the ships produced in the LCS program, LCS-1, *USS Freedom*, launched on September 23, 2006, and featured a semi-planing monohull.  *Id.* at 602-03.  In 2008, FastShip filed an administrative claim with the Navy, contending that the LCS program infringed on its patents.  *FastShip II*, 122 Fed. Cl. at 77.  The Navy responded to the administrative claim two years later, stating that, after investigation, it believed the LCS program did not infringe on FastShip's patents and denying any compensation.  *Id.*

---

(awarding attorneys' fees and expenses), *vacated and remanded, FastShip, LLC v. United States*, 968 F.3d 1335 (Fed. Cir. 2020) ("*FastShip VI*").

Subsequently, in August 2012, FastShip filed its complaint in this court. *FastShip II*, 122 Fed. Cl. at 77. FastShip's claims addressed ships produced within the *Freedom* class of the LCS program. *Id.*[3] The parties submitted briefs on claim construction, and the court held a *Markman* hearing and in October 2013 issued an opinion construing eight of the claim terms. *FastShip I*, 114 Fed. Cl. 499.

After the parties conducted discovery, the government moved for summary judgment. *FastShip II*, 122 Fed. Cl. at 77. The court granted the government's motion with regard to LCS-3 and the subsequent ships in the *Freedom* class on the ground that those ships "were not 'manufactured' by or for the government within the meaning of 28 U.S.C. § 1498 prior to the expiration of the patents in suit." *Id.* at 86. Following this decision, FastShip's remaining infringement claims only concerned LCS-1, *USS Freedom*. *FastShip III*, 131 Fed. Cl. at 607.

After a site visit to the constructing shipyard, the court held a 10-day trial in October 2016. *FastShip III*, 131 Fed. Cl. at 607.[4] The court ultimately issued a decision in April 2017, finding that the '032 and '946 patents were valid, and that the government, through the construction of its LCS-1 ship, directly infringed FastShip's patents. *See id.* at 618. The court awarded FastShip $6,449,585.82 in damages plus interest for delayed compensation. *Id.* at 627. Additionally, the court stated that FastShip could apply for "reasonable costs and reasonable fees for expert witnesses and attorneys under 28 U.S.C. § 1498(a) . . . within 30 days after any appellate process has been concluded." *Id.* at 627-28. On appeal, the Federal Circuit affirmed this court's decision of infringement as to LCS-1 and its grant of summary judgment in the government's favor as to LCS-3 and subsequently manufactured ships, while modifying the damages amount due to a transcription error. *FastShip IV*, 892 F.3d at 1310. Each party was to "bear its own costs" for the appeal. *Id.* at 1311.

### B.  Costs and Fees Pursuant to 28 U.S.C. § 1498(a)

After prevailing on the appeal, FastShip filed a motion for attorneys' fees and related expenses and a bill of costs in October 2018. *See* ECF Nos. 190-91. The government opposed FastShip's motion. *See* Def.'s Objs. to Pl.'s Bill of Costs, ECF No. 201; Def.'s Resp. to Pl.'s Mot. for Att'ys' Fees, ECF No. 203. The parties fully briefed the motion, *see* ECF Nos. 211-12,

---

[3] The *Freedom* class of LCS are designated as LCS-1, 3, 5, 7, 9, 11, *et al.*, taking into account the design and construction of a second class of littoral combat ships, the *Independence* class, designated as LCS-2, 4, 6, *et al.* The *Independence* class of ships employs a different hull design. *See* Pl.'s Mem. in Supp. of its Mot. for Atty's Fees and Related Expenses ("Pl.'s Mem.") at 3 n.2, ECF No. 233-1.

[4] The trial transcript was filed in ten volumes, one for each day of trial. *See* ECF Nos. 129, 131, 133, 135, 137, 141, 143, 145, 147, 149. Following the protective order entered in this case, the transcripts were redacted. *See* ECF Nos. 154, 156-164. Citations to the trial transcripts will be cited as follows: "Trial Tr. Vol. XX page number:line number." The date will be omitted from the citation.

and the court held a hearing on April 3, 2019.[5]  In June 2019, the court entered an opinion awarding FastShip attorneys' fees and costs. *FastShip V*, 143 Fed. Cl. at 735.  The court— building on its prior determination in *Hikansut LLC v. United States*, 142 Fed. Cl. 341 (2019)— stated that "[t]he text of 28 U.S.C. § 1498(a) refers to a single 'position of the United States' . . . [and] makes no distinction between the pre-litigation position and the position taken once litigation commences." *FastShip*, 143 Fed. Cl. at 719 (quoting *Hikansut*, 142 Fed. Cl. at 357). The court thus considered "*all* of the government's conduct . . . when determining whether the position of the United States was 'substantially justified.'" *Id.* at 720 (emphasis in original). Ultimately, the court determined that that government's "overall conduct demonstrates its position was ultimately not 'substantially justified' when viewed in totality," *id.* at 723, and awarded FastShip $6,178,288.29 in attorneys' fees and $1,229,679.07 in costs, *id.* at 735.

An appeal followed.  *See FastShip VI*, 968 F.3d 1335.  The Court of Appeals for the Federal Circuit found that this court erred by relying on the government's pre-litigation conduct when determining whether the position of the United States was substantially justified. *Id.* at 1338-39.  The Federal Circuit stated that because the decision relied "in large part on pre-litigation conduct and did not conclude that the litigation conduct itself was sufficient for an award of fees, a remand [was] required." *Id.* at 1339.  The Circuit directed this court on remand to "consider whether the government's litigation conduct alone, to the extent that it was not substantially justified, was sufficient to justify a fee award." *Id.*[6]

FastShip thereafter renewed its motion for attorneys' fees and costs.  *See* Pl.'s Renewed Mot. for Att'ys' Fees & Related Expenses ("Pl.'s Mot."), ECF No. 233; Pl.'s Mem.; Pl.'s Renewed Mem. in Supp. of its Bill of Costs ("Pl.'s Bill of Costs"), ECF No. 236.  FastShip argues that the government's litigating positions were not substantially justified, and therefore, it is entitled to attorneys' fees and costs associated with the litigation.  *See* Pl.'s Mem.  The government counters with three alternative arguments.  Def.'s Resp, ECF No. 235.  It first argues that FastShip's "renewed [Bill of Costs is] impermissibly untimely." *Id.* at 8.  Additionally, the government argues that its litigation position was substantially justified, *id.* at 8-29, or, if the court awards costs and fees, FastShip should be awarded a reduced amount, *id.* at 29-39.  The motion has been fully briefed, *see* Pl.'s Reply, ECF No. 238; Def.'s Sur-Reply, ECF No. 240. FastShip filed a supplemental memorandum detailing "additional documentary support for fees incurred since the time of its renewed motion."  Pl.'s Suppl. Mem. at 2, ECF No. 242.  The court held a hearing on January 26, 2021.

## STANDARDS FOR DECISION

### A.  *"Substantially Justified"*

Title 28, Section 1498 of the United States Code governs the award of compensation in patent cases.  When the United States manufactures or otherwise uses a patented invention

---

[5] FastShip additionally filed two supplemental memoranda to support its motion for attorney's fees and bill of costs.  *See* ECF Nos. 196-97.

[6] Additionally, the Federal Circuit stated that there were "[n]o costs" for either party. *FastShip VI*, 968 F.3d at 1340.

"without license . . . or lawful right to use or manufacture the same," the patent owner may recover "reasonable and entire compensation for such use." 28 U.S.C. § 1498(a).  The Section defines "[r]easonable and entire compensation" as "includ[ing] the owner's reasonable costs, including reasonable fees for expert witnesses and attorneys."  *Id.*  To qualify for such compensation, (1) the owner of the patent must be "an independent inventor, a nonprofit organization, or an entity that had no more than 500 employees,"[7] and (2) the court must not determine that "the position of the United States was substantially justified."  *Id.*  The government has the burden to show that its position was substantially justified.  *FastShip VI*, 968 F.3d at 1338 (citing *Doty v. United States*, 71 F.3d, 384, 385, (Fed. Cir. 1995)).

When evaluating whether "the position of the United States was substantially justified," the Federal Circuit has held that this court should apply the common-law definition of the phrase "the position of the United States."  *Hitkansut LLC v. United States*, 958 F.3d 1162, 1168 (Fed. Cir. 2020).  As such, "'the position of the United States' as used in § 1498(a) refers to the litigation positions taken by the United States in the civil action in which the attorneys' fees were incurred."  *Id.*  However, "nothing . . . prevents the [court] from looking to the facts of an individual case, including facts that occurred pre-litigation, when deciding whether [the government's] litigation positions were substantially justified."  *Id.*

The court, in applying "the 'substantially justified' test, asks whether a position is 'justified in substance or in the main—that is, justified to a degree that would satisfy a reasonable person.'"  *Hitkansut*, 958 F.3d at 1168 (quoting *Commissioner, Immigr. & Naturalization Serv. v. Jean*, 496 U.S. 154, 158 n.6 (1990) (additional citation omitted)).  The government's litigation "positions 'lack[] substantial justification' when they are 'unsupported by the facts'" *Id.* at 1168-69 (quoting *Hitkansut*, 142 Fed. Cl. at 359 (2019) (alteration in original)).

### B.  Reasonable Fees

Section 1498(a) states that "[r]easonable and entire compensation . . . include[s] the owner's reasonable costs, including reasonable fees for expert witnesses and attorneys."  28 U.S.C. § 1498(a).  When considering the reasonableness of an award of fees, the "most useful starting point . . . is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Hubbard v. United States*, 480 F.3d 1327, 1332 (Fed. Cir. 2007) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  Courts, in calculating the amount of fees to award, look to "a number of factors, of which 'the most critical factor is the degree of success obtained.'"  *Id.* (citing *Hensley*, 461 U.S. at 436).

---

[7] The parties agree that FastShip meets the first requirement.  *See* Pl.'s Mot. at 9-10; Def.'s Resp. at 6 n.1 ("The government does not dispute that FastShip qualifies under [the 500-employee] limitation.").

## ANALYSIS

### I.    Timeliness of FastShip's Bill of Costs

Prior to analyzing FastShip's motion and bill of costs, the court must address the first issue raised by the government, *i.e.*, that FastShip's bill of costs is untimely.  *See* Def.'s Resp. at 7-8.  Defendant characterizes FastShip's renewed bill of costs as a successive fee request, noting that the court has previously refused to accept successive fee requests.  Def.'s Sur-Reply at 6 (citing *Hitkansut*, 142 Fed. Cl. at 360, and *Bratcher v. United States*, 138 Fed. Cl. 543, 547-48 (2018)).  FastShip argues alternatively that it was either not required to renew its bill of costs, *see* Pl.'s Bill of Costs at 2 n.2, or that it filed within 30 days of the expiration of the available period for FastShip to petition the United States Supreme Court for certiorari, *see id.* at 7 n.4.

The Rule 54 of the Rules of the Court of Federal Claims ("RCFC") states that a party seeking costs must file its bill of costs "within 30 days after the date of final judgment, as defined in 28 U.S.C. § 2412(d)(2)(G)."  RCFC 54(d)(1)(B)(i).  Section 2412(d)(2)(G) defines "final judgment" as "a judgment that is final and not appealable."  28 U.S.C. § 2412(d)(2)(G).  The Federal Circuit filed its decision vacating and remanding on August 3, 2020, and the mandate issued on September 24, 2020.  *See* ECF Nos. 226-27.  Under Rule 13 of the Rules of the Supreme Court to the United States, "a petition for a writ of certiorari to review a judgment in any case . . . entered by . . . a United States court of appeals . . . is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment."  Sup. Ct. R. 13(1).  According to this Supreme Court Rule, FastShip had 90 days following the issuance of the Federal Circuit's decision to timely file a petition for certiorari.  *See* Sup. Ct. R. 13(1).  The ninetieth day following the Federal Circuit's decision was November 2, 2020.  On that day, the Federal Circuit's judgment was considered "final and not appealable."  28 U.S.C. § 2412(d)(2)(G).  FastShip filed its renewed bill of costs on December 2, 2020, 30 days later.  *See* ECF No. 236.  Thus, FastShip's bill of costs was filed "within 30 days after final judgment," RCFC 54(d)(1)(B), and is therefore timely.[8]

### II.    Whether the Government's Litigating Position Was Substantially Justified

The government argues that its litigating position, when considered as a whole, was substantially justified.  *See* Def.'s Resp. at 8-29.  FastShip extensively counters that the government's position was unreasonable throughout the course of litigation.  *See* Pl.'s Mem. at 10-36.  When determining whether the government's conduct was substantially justified, the court must inquire whether the government's position was "justified to a degree that would satisfy a reasonable person."  *Hitkansut*, 958 F.3d at 1168 (citations omitted).  Because the government bears the burden, the court will look at the government's justifications to determine if, on the whole, the government's position was substantially justified.

The government argues that, despite losing on the merits both at trial and on appeal, its litigating position, when viewed in totality, was substantially justified.  *See* Def.'s Resp. at 8-29.

---

[8] The government's arguments about successive bills of cost and motions for attorneys' fees also fail to persuade, given the timing of FastShip's renewed motions on remand.

The government first supports its argument by stating that it litigated in good faith and did not engage in fraud. *Id.* at 9-13.[9] The government then states that the arguments it advanced during the non-infringement and invalidity proceedings were substantially justified. *Id.* at 13-29.

In support of an award of fees and costs, FastShip elaborates various positions taken by the United States that lacked merit. Primarily, those positions related to whether the patented hull design and waterjet powering mechanism and design enabled the ships to gain higher speeds in the water by lifting the stern and reducing drag. *See e.g.* Pl.'s Mem. at 14-15. Plaintiff's patents specified three components that contributed to lift: a hooked hull design, configuration of the waterjet inlets, and inclusion of interceptors near the stern. *See* '946 patent col. 5, lines 64-68; col. 6, lines 7-11; col. 14, lines 18-23; '032 patent col. 9, lines 38-46; col. 10, lines 14-24; col. 14, lines 23-28. FastShip first points to the government's response to one of FastShip's interrogatories. Pl.'s Mem. at 14. In that response, the government indicated that "there is no evidence . . . of an area in the stern section of the LCS-1 and LCS-3 with hydrodynamically generated pressure sufficient in magnitude to produce an upward rather than downward force vector." Pl.'s Mot at 14. Put differently, the government would have it that the stern of the hull of the *Freedom* class of LCS ships was not subject to lift but was able to maintain a high rate of speed solely because of the power the ships generated. The government maintained this argument—that the ships did not produce upward lift at the stern based on their design — throughout the course of litigation. *See, e.g.*, Def.'s Post-Trial Br. at 26, ECF. No. 165. This contention was disputed by evidence disclosed during discovery, *see Fastship III*, 131 Fed. Cl. at 612-13, and even by the government's own expert at trial. Despite the lack of support for this position, the government applied it consistently throughout litigation.

### A.  Errors in Government's Scaled Model

The government prepared a scale model of the LCS-1 design for testing at its Carderock Division, Naval Surface Warfare Center, and introduced the results of that testing at trial. *See FastShip III*, 131 Fed. Cl. at 603-05. Discrepancies in the government's model stern undermined the government's position. *See generally id.* at 611-18. Both patents explicitly anticipate that the hull would include a hook. '032 Patent, col. 6, lines 1-2 (noting the "buttock lines with a slight downward hook terminating sharply at a transom stern); '946 Patent, col. 5, lines 67-68 (same).[10] Whether the LCS-1 model had a hook at the stern, whether it had been included in the

---

[9] The fact that the government litigated in good faith or did not engage in fraud is not the standard upon which the court evaluates the government's arguments on a motion for fees and costs under Subsection 1498(a). *See Hitkansut*, at 142 Fed. Cl. at 357 ("That a litigation position may be reasonable in the abstract . . . does not mean that the litigation position as applied to a specific case remains reasonable when contradicted or unsupported by the factual record.").

[10] As the court described in its merits opinion, a hooked stern is also called a "stern wedge." *FastShip III*, 131 Fed. Cl. at 613. "Generally, the purpose of a hook is to change the trim of the ship by moving the stern upward," *id.*, because "the hydrodynamic lift is influenced strongly by the buttock shape of the hull bottom as you approach the stern of the [semi-planing] vessel," Trial Tr. Vol. 7 1651:10-15 (Test. of Donald Blount, a government expert).

various model testing, and the extent to which a hook affected the hydrodynamics and speed of the LCS-1 model were disputed during the litigation.

Prior to trial, the court and expert witnesses conducted a site visit to Carderock and observed the model used in the government's testing. *FastShip III*, 131 Fed. Cl. at 604 n.11. Upon inspection of the model's stern, as seen at Carderock and in photos admitted into evidence at trial, the model appeared to have a "rocker" stern. *Id.*[11] The LCS-1's lines and hull plans, however, indicate that the ship had a hooked stern rather than a rocker stern. *Id.* The government conducted a waterjet flow test on the model and "argue[d] that the waterjets counteract lift rather than cause additional lift." *Id.* at 616. These data were not indicative of the LCS-1 as the model was not designed properly with a hook stern. *Id.* at 604 n.11. The court noted in its opinion on the merits that the model "as inspected, [did] not accurately represent the stern of the LCS-1" and that the totality of the evidence indicated that the LCS-1 did, in fact, have a hook stern as contemplated by the patents. *Id.*[12]

---

[11] A rocker stern curves upward at the bottom of the hull at the stern of a ship. *See Fastship III*, 131 Fed. Cl. at 603 n.9.

[12] At one point, the government proposed that the scale model was built with a hook but over time it had warped in a way that eliminated that feature and resulted in a rocker shape. Counsel for the government suggested this theory during a line of questions during cross-examination of FastShip's expert Dr. Garwin:

> Mr. Bolden. And I believe you stated that the model that you saw at Carderock did not have a hook?
>
> Dr. Garwin. Correct.
>
> Q. Do you know at the scale of the model how big the hook would have been at the transom?
>
> A. Yes. The hook would have been about a third of an inch, so six inches on the full size [model] and the scale factor of 18, so about a third of an inch, easily visible. Instead of coming down a third of an inch, it went up at least two-thirds of an inch.
>
> Q. And do you know whether the model that you saw was warped?
>
> A. I don't think a model like that could be warped. No.
>
> Q. What about if the model was stored for six years and supported on its bow and its stern only? You don't expect that it would be warped in that condition?
>
> A. No, I do not.

Trial Tr. Vol. 10 2302:16 to 2303:8.

The lack of a hooked stern was assumed by the government throughout litigation and contributed to the lack of accurate forecasting by its principal expert, Dr. Stern, and its arguments offered before and after trial.  For example, in its post-trial briefs, while FastShip argued that "the hooked stern of LCS-1 cause[d] high pressure and therefore cause[d] hydrodynamic lifting of the stern as the ships gains speed," the government maintained that the "hydrodynamic lifting of the stern would only occur at speeds above which LCS-1 has been shown to achieve."  *FastShip III*, 131 Fed. Cl. at 611 (citations omitted).[13]  Based on the court's finding that the totality of the evidence showed that LCS-1 included a hooked stern, a reasonable person could not conclude that the government was justified in consistently asserting otherwise.  *See Hitkansut*, 958 F.3d at 1168 (citations omitted).

### B.  Incorrect Units in Figure 11

In the same general vein, the government pointed to an aspect of the patents themselves in an effort to show that the hull design of the LCS-1 was not efficient.  Both the '032 patent and the '946 patent include a figure 11.  *See* '032 patent, fig. 11; '946 patent, fig. 11.  Figure 11 provides a line graph representation of shaft horsepower as compared to ship speed.  '032 patent, fig. 11; '946 patent, fig. 11.  At trial, the government provided a misleading graph showing information for LCS-1, prepared by counsel, using imperial units, instead of the metric units reflected in figure 11.  *FastShip III*, 131 Fed. Cl. at 617.  The use of imperial units made the LCS-1 displacement hull appear to be inefficient.  *See id.*  Further, the government's principal expert based his analysis and opinion on these incorrect representations of data.  *See infra*; *FastShip V*, 143 Fed. Cl. at 721-22.  The government's counsel continued to use imperial units, throughout the trial and post-trial briefing, despite being told of the error on the first day of trial.  *See FastShip V*, 143 Fed. Cl. at 721 n.12.[14]

---

[13] The court detailed the government's mistaken arguments in this regard in its merits opinion.  *See FastShip III*, 131 Fed. Cl. at 611-15.  Particularly, the court discussed the findings and testimony of one of FastShip's experts, Dr. Richard Garwin, an eminent physicist, in which Dr. Garwin described the existence of the hook and its effect on LCS-1's hydrodynamics.  *See id.*  The court accepted that testimony, and it directly contradicted the government's non-infringement arguments.  *See id.*

[14] The patents' inventor, Mr. Giles, testified on the first day of trial. During an exchange with the government's lawyer Mr. Zager regarding figure 11, Mr. Giles stated that figure 11 used metric units:

Mr. Zager. The Y axis says "Shaft horsepower times 1000." Is that correct?

Mr. Giles. Um-hum, yes.

Q. You also discussed effective horsepower this morning –

A. Yes.

This court previously held that the government's position as it related to figure 11 was not substantially justified. *FastShip V*, 143 Fed. Cl. at 721-22. On appeal, the United States Court of Appeals of the Federal Circuit affirmed this part of the court's determination, stating that it saw "no clear error in the Claims Court's factual findings here or its conclusion that the government's position here was not substantially justified." *Fastship VI*, 968 F.3d at 1340. Such a position continues to be "unsupported by the facts," *Hitkansut*, 958 F.3d at 1169 (citations omitted), and therefore, the court finds that the government's erroneous misconstruction of figure 11 had no justification.

## C. *Expert Analysis*

Dr. Frederick Stern, one of the government's principal experts at trial, provided analysis central to the government's non-infringement arguments, making serious mistakes in both his computational drag analysis related to flow dynamics and in his related testimony at trial. *See FastShip III*, 131 Fed. Cl. at 616. The government relied on these flawed computational fluid dynamics calculations to assert that the LCS-1 hull did not generate high pressure causing hydrodynamic lift under the stern. *Id.* at 613 n.22. FastShip provided evidence and testimony at trial related to the complex nature of the computational fluid dynamics calculations. *See, e.g.*, Trial Tr. Vol. 10 2313:6-10 (Dr. Garwin: "[M]y experience in doing computer analysis is that it requires an enormous effort . . . to make sure that the analysis is done right."). Central to this error was Dr. Stern's "overestimat[ion of] the force of the waterjets by a factor of four." *Id.* at 616 (citations omitted). Plaintiff's expert Dr. Garwin, rebutting Dr. Stern's analysis and testimony at trial, stated that the results of Dr. Stern's analysis "should have been a red flag." Trial Tr. Vol. 10 2286:16-17. To create Dr. Stern's results at 40 knots, the ship would have required "400,000 horsepower rather than 100,000 horsepower in the actual ship." *Id.* at 2286:17-18. Dr. Garwin further indicated that if he or "a graduate student or a colleague had been faced with this result from our computation, [they] would have said stop right here until we understand this." *Id.* at 2286:19-22. While Dr. Stern stated that that the primary focus of his analysis was not on the power or drag components and thus it was reasonable for him to continue with the analysis regardless of the error, Dr. Garwin suggested that analysis could not reasonably have proceeded until the source of the inaccuracy was discovered and corrected. *Id.* at 2287:8-13 (Dr. Garwin: "In my opinion, they have made a foolish blunder someplace, but they have not looked to see where that blunder is, and they just assume[d] that the computation [wa]s correct

---

Q. – in another context.

A. Yes.

Q. What is the difference between shaft horsepower and effective horsepower?

A. Well, it's variously expressed. This is actually shaft horsepower in kilowatts, and sometimes, as you can see, I think in some of your own disclosures, by the – by Carderock, the – it says horsepower EHP, or shaft horsepower, BHP, SHP, or kilowatts.

Trial Tr. Vol. 1 205:6-20.

and [went] on to look at small differences among large numbers and represent[ed] that that represents the lift or absence of lift due to waterjets.")

Dr. Stern also failed to take into account "key characteristics of the performance of the model-scale and full-size LCS-1" and "the scaling of the hydrodynamic boundary layer" between the hull and the sea. *FastShip III*, 131 Fed. Cl. at 616. Specifically, Dr. Stern's analysis did not include a hook or interceptors on the LCS-1 model hull. *Id.* at 613 n.22; Trial Tr. Vol. 8 1783:4-5 (Dr. Stern: "I was not aware of a hook . . . in the geometry of LCS-1."). Further, Dr. Stern's analysis "ignore[d] the well-known and undisputed fact" associated with using a smaller scale model—that the boundary layer under the hull of the ship is two and a half times thicker on the model relative to the full-sized ship. Trial Tr. Vol. 10 2289:15-17; 2292:6-18 (Garwin). This difference affected drag and boundary flow, both of which were not considered by Dr. Stern. *Id.* at 2290:9-10; 2292:6-12. Additionally, because "the interceptors generate high pressure at the stern, and therefore generate upward lift," *FastShip III*, 131 Fed. Cl. at 615, their absence from Dr. Stern's analysis resulted in lesser lift at the stern of the ship than was reflected in full-size LCS-1, *id.* at 613 n.22.

After determining that "Dr. Stern's model and methodology render[ed] his calculations unreliable," the court afforded Dr. Stern's analysis "little weight." *FastShip III*, 131 Fed. Cl. at 613 n.22. Dr. Stern served as the government's primary expert, and the government relied upon his analysis to show a lack of infringement. *See id.* The pervasiveness of the errors in Dr. Stern's analysis and testimony, as well as the government's heavy reliance upon his analysis in preparation for and during trial, were not "justified to a degree that would satisfy a reasonable person," *Hitkansut*, 958 F.3d at 1168 (citations omitted), and were "unsupported by the facts," *id.* at 1169 (citation omitted).

The burden in proving reasonableness is on the government, and the court finds the government has failed to carry that burden in this case. Although parts of the government's conduct could be seen as reasonable when viewed in isolation,[15] its overall conduct demonstrates its position was ultimately not "substantially justified" when viewed in totality.

### III.    Reasonable Fee Amount

Because the court determines that the government's litigation position, on the whole, was not substantially justified, the court must consider the proper amount of fees that should be awarded to FastShip. As a preliminary matter, the court must address whether it can consider plaintiff's supplemental memorandum filed on January 25, 2021, in support of its motion for attorney's fees. *See* ECF No. 242. The purpose of this memorandum was to supplement its original request for attorney's fees with expenses incurred since FastShip filed its renewed

---

[15] For example, the government was ultimately successful on summary judgment regarding all ships produced after the LCS-1. As the court stated previously, "[t]he claims regarding the LCS-3 and later *Freedom* class ships were, in effect, time barred . . . because the patents had expired" at the time the LCS-3 ship was manufactured. *FastShip V*, 143 Fed. Cl. at 722 (citations omitted). The government's position, as a whole, can lack substantial justification "even though [the government] may have taken reasonable stances in some respects." *Id.* at 723.

motion on October 30, 2020.  *Id.* at 1.  Plaintiff requested an additional $138,857.00 in fees and expenses, as of January 24, 2021, and provided documentary evidence supporting the hours worked and the expenses incurred.  *See id.* Ex. 1, ECF No. 242-2.  The government argues that FastShip's supplemental memorandum is "untimely."  Hr'g Tr. 18:22-23.[16]  Much like its general argument about timeliness, the government contends that "FastShip can't do these fee requests by installment."  *Id.* at 20:21-22.

However, much like FastShip's bill of costs, the court views the supplemental memorandum as timely.  While the government is correct that this court in *Hitkansut* stated "[t]he court cannot entertain multiple, successive fee requests," the plaintiff in that case had not submitted its request for additional fees.  142 Fed. Cl. at 360.  Because FastShip is requesting "fees or expenses [that] were included in its application or have since been provided," *id.*, the group accepts FastShip's supplemental memorandum.[17]

The government contends that, even if its litigation positions were substantially unjustified, FastShip's fees should be reduced.  Def.'s Resp. at 29-39.  In doing so, the government cites its successes during litigation, such as the court's grant of its motion for partial summary judgment as to ships built after LCS-1 and its success on appeal of that issue.  *Id.* at 30-31.  Additionally, the government argues that the court should reduce FastShip's requested fees to a reasonable level as it did previously.  *Id.* at 37-38.  The court partially agrees with the government about fee reductions and will reduce FastShip's requested fees as specified below.

## IV.     Fees for Various Aspects of the Litigation

### A.   Dismissal of the LCS-3 Claim

The government argues that "FastShip is not entitled to fees for opposing the Government's successful motion for partial summary judgment" that resulted in the dismissal of FastShip's claims related to the LCS-3 and all subsequent *Freedom* class ships.  Def.'s Resp. at 30.  FastShip contends that despite the government's success on summary judgment, FastShip "utilized a significant amount of evidence that focused on the LCS-3 in its successful proof of infringement by the LCS-1."  Pl.'s Mem. at 56.  As a result, FastShip argues that its stated attorneys' fees "were reasonably incurred to advance the claims on which FastShip prevailed in this case."  *Id.* at 57.

The court partially agrees with FastShip.  As the court previously stated, "FastShip's award for attorneys' fees and costs should not be reduced because it was unsuccessful on a subsidiary aspect of its claim."  *FastShip V*, 143 Fed. Cl. at 723-24 (citing *Hitkansut*, 142 Fed.

---

[16] FastShip filed its supplemental memorandum after the government filed its sur-reply. *See* Def.'s Sur-Reply (filed December 18, 2020); Pl.'s Suppl. Mem. (filed January 25, 2021). The government therefore did not have the opportunity to respond in writing but did so during the hearing on January 26, 2021.

[17] While the court accepts FastShip's supplemental memorandum as timely, the requested fees will be subject to the limitations detailed below.

Cl. at 364). FastShip filed one count of infringement in this court. *See* Compl. ¶¶ 16-18, ECF No. 1. FastShip prevailed on its sole claim before this court: that the ships built by the United States Navy infringed on FastShip's patents. *FastShip III*, 131 Fed. Cl. at 627. The Federal Circuit, in affirming this court's decision in *Hitkansut*, stated that a fee award was appropriate when the plaintiff is "succe[ssful] on its sole claim, and prove[s] a material amount of actual, compensable damages." *Hitkansut*, 958 F.3d at 1170. Had the court found that LCS-3 also infringed on FastShip's patents, FastShip would have received additional damages. The additional damages that could have resulted from infringement on later *Freedom* class ships would have stemmed from FastShip's basic claim. Because FastShip succeeded on its sole claim of infringement, the court will not reduce FastShip's attorneys' fees and costs because it was "unsuccessful on a subsidiary aspect of its claim." *FastShip V*, 143 Fed. Cl. at 723-24.

### B.   Motions Practice with Austal

The government next argues that "FastShip is not entitled to fees for its motion to compel production for Austal, a subpoenaed third-party to the litigation" because the "Government's position in the litigation had nothing to do with the interactions and disputes of Austal and FastShip." Def.'s Resp. at 31.[18] The government further contends that it would be "unfair to shift these fees to the Government for assisting in the matter, where the fees would have been the responsibility of FastShip and/or Austal if the Government had not assisted." *Id.* at 32. The government's argument that it helped resolve the situation amicably, FastShip argues, is speculation. Pl.'s Reply at 16.

The court declines to reduce FastShip's hours on this point. As the court stated in its prior opinion, "FastShip was only required to issue the subpoena to third-party Aust[]al due to the government's insistence that it did not possess the documents at issue." *FastShip V*, 143 Fed. Cl. at 725. While FastShip's motion to compel was not directed at the government, the motion was likely what "brought the two parties together to reach an agreement that did not require the court's intervention." *Id.* Therefore, the court will not exclude the Austal motion to compel from the calculation of attorneys' fees and costs.

### C.   Computational Fluid Dynamics Analysis

The government states that the court should deny FastShip fees associated with "its failed efforts to engage experts . . . in Sweden." Def.'s Resp. at 32. FastShip worked with experts in Sweden "to conduct a computational analysis regarding the hydrodynamic properties of the hull of the LCS." Pl.'s Reply at 16. FastShip ultimately did not pursue the computational fluid dynamics analysis. *See id.* According to the government, this expert work "was never disclosed, cited, or relied on by FastShip or its experts" and, therefore, FastShip should not be able to recover the $349,292.50 in fees and expenses associated with it. Def.'s Resp. at 32. FastShip

---

[18] Early in litigation, FastShip filed a motion to compel against non-party Austal USA, LLC ("Austal"). *See* Mot. to Compel, ECF No. 39. After the motion was fully briefed, the court held a hearing. During the hearing, the parties informed the court that they had reached an agreement concerning the discovery dispute, and the court subsequently denied the motion as moot. *See* Order of July 18, 2014, ECF No. 59.

maintains that this computational analysis "was essential to FastShip in understanding the limitations of computational fluid dynamics . . . to model and compute the hydrodynamic properties of large naval vessels such as LCS-1." Pl.'s Reply at 16.

The court agrees with FastShip. While the government is correct that FastShip did not introduce this analysis at trial nor therefore could the court rely upon it in its opinion on the merits, *see* Def.'s Resp. at 33, it does not follow that "this work was not a necessary expense," *id.* at 32. Plaintiff's expert Dr. Garwin referenced the expert work at trial. Trial Tr. Vol. 10 2311:23 to 2315:19. Dr. Garwin's opinion, combined with an understanding of the complexity and limitations of the computational fluid dynamics analysis provided by the experts in Sweden, allowed FastShip to rebut the government's non-infringement case. *See* Pl.'s Reply at 16. Specifically, the process of pursuing computational fluid dynamics data resulted in the development of FastShip's litigation strategy, including its successful challenge to Dr. Stern's analysis of boundary fluid flow around the hull. *See* Trial Tr. Vol. 10 2290:9-10, 2292:6-12. Therefore, there is no basis to exclude the computational fluid dynamics analysis from FastShip's fee award.

### D.  Appeals to the Federal Circuit

The government next argues that "FastShip is entitled to no more than half of the fees" from both the first and second appeal. Def.'s Resp. at 33-34. The government contends that FastShip advanced "unmeritorious and unsuccessful appellate positions" and should have its fees reduced accordingly. Def.'s Sur-Reply at 17. FastShip counters that its first appeal "resulted in an affirmance of this Court's findings of infringement of the LCS-1 and non-infringement of the LCS-3, and the damages award to FastShip was increased." Pl.'s Reply at 16. While the second appeal resulted in the Federal Circuit overturning this court's legal determination concerning the term "substantial justification," FastShip argues that it prevailed on another issue, the government's reliance on the incorrect units in figure 11, and is therefore entitled to fees stemming from the appeal. *Id.* at 16-17.

As the court stated in its prior opinion, "both sides c[an] claim victory for the appellate court's decision" as to the first appeal. *FastShip V*, 143 Fed. Cl. at 724 ("[T]he government was successful in having the summary judgment regarding the LCS-3 affirmed, but the finding of infringement at trial was also affirmed."). Thus, because "a fee award presumptively encompasses all aspects of the civil action," *Jean*, 496 U.S. at 161, FastShip is entitled to fees for the initial appeal.

FastShip, however, overstates its success as to the second appeal. The government unilaterally appealed, arguing that this court erred by relying on the government's pre-litigation conduct when determining whether the government's conduct was substantially justified. *FastShip VI*, 968 F.3d at 1338. The Federal Circuit agreed with the government, holding that, "[o]n remand, the Claims Court must consider whether the government's litigation conduct alone, to the extent it was not substantially justified, was sufficient to justify a fee award." *Id.*

FastShip's limited success as to a factual issue only entitles it to half its attorneys' fees for the second appeal.[19]

## E.  Settlement Discussions

The government further contends that FastShip should not receive attorneys' fees for "responding to settlement discussions initiated by the Government."  Def.'s Resp. at 37. According to the government, it would be "unjust to shift these fees to the Government for engaging in a good-faith attempt to amicably resolve the litigation."  Id.  The court agrees with FastShip that the government "provides no support for this contention."  Pl.'s Reply at 19. While generally the government's good or bad faith could result in a finding about substantial justification of its conduct, the government's good faith attempts to settle the dispute do not warrant a reduction in fees after a finding, as in this case, that the government's litigating positions were not substantially justified.

## F.  Preparing the Fee Motions

Finally, the government avers that FastShip should not be awarded fees for its allegedly deficient filings in this court.  Def.'s Resp. at 34-35.  After the initial motion for attorneys' fees was fully briefed, the court entered an order stating that documentation containing entries was "deficient."  Order of June 5, 2019, ECF No. 219.  The court requested that FastShip "provide the court with support that details the number of hours worked by each attorney and support staff[,] . . . the rates charged by those attorneys and support staff, and the dates for each of the time entries."  Id.  FastShip subsequently filed the requested documentation on June 12, 2019. See Pl.'s Resp. to the Ct.'s Order of June 5, 2019, ECF No. 220.  The government asserts that "FastShip is not entitled to shift fees resulting from deficient filings."  Def.'s Resp. at 34.

The government also contends that recovery should be reduced because arguments in the present motion are "significantly copied-and-pasted" from the 2018 fee-recovery motion.  Def.'s Resp. at 35.  The government notes the similarities between the plaintiff's 2018 fee requests and the present fee request, stating that 34 sections are "substantively copied" and 9 sections are "partially copied."  Id.

Nonetheless, the court's request for additional documentation and the necessity of preparing refreshed motions upon remand does not necessarily merit the government's requested reduction in hours.  FastShip is entitled to recover "all reasonably incurred fees."  Hitkansut, 142 Fed. Cl. at 360 (citing Jean, 496 U.S. at 156).  The court will examine the fees requested and rates charged to determine if they are reasonable.

---

[19] As a result, the court will halve the attorneys' fees requested by FastShip between the filing of the notice of appeal, August 30, 2019, see ECF No. 225, and the issuance of the Federal Circuit's decision, August 3, 2020, see ECF No. 226.

*V.    Reduction of FastShip's Requested Attorneys' Fees and Expert Witness Fees*

*A.    Attorneys' Fees*

The court must next determine whether the attorneys' fees sought by FastShip should be awarded in full.  In its prior opinion, the court provided a detailed discussion of the process to determine reasonable hourly rates for attorneys' fees under fee-shifting statutes.  *FastShip V*, 143 Fed. Cl. at 726-28.  The court looked to the American Intellectual Property Law Association's 2017 Report of the Economic Survey ("AIPLA Survey").  *Id.* at 727.  The AIPLA Survey provides a summary of "attorneys' fees in intellectual property litigation, broken down by geographic location, levels of experience, and other categories."  *Id.*  The report provides an average hourly rate, a median rate, and a 90th percentile rate for attorneys in Washington, D.C. *Id*. at 728.  The court considered each attorney's level of experience and expertise, determining that the third-quartile rates were appropriate for partners and associates.  *Id.*

For FastShip's two attorneys of record, Mark L. Hogge and Rajesh C. Noronha, FastShip requested an average hourly rate of $835 and $669 respectively.  *FastShip V*, 143 Fed. Cl. at 728-79.  These rates were above the relevant average rates for partners and associates in Washington, D.C.  *Id.*  The court therefore awarded a third-quartile hourly rate of $681 for Mr. Hogge, totaling $1,568,819.70, and a third-quartile hourly rate of $555 for Mr. Noronha, totaling $1,762,180.50.  *Id.*  The court next found that the requested fees for associates, Gary D. Mangels, Matthew P. Larson, James F. Wiley, Jr., and Thomas R. Millar, and partners, Nicholas H. Jackson and Shailendra K. Maheshwari, were reasonable because they were lower than the 2017 AIPLA Survey third-quartile hourly rates.  *Id.* at 729.  FastShip was awarded $1,431,206.69 in fees for these attorneys.[20]  *Id.*

The court next turned attorneys who billed fewer than 75 hours.  *FastShip V*, 143 Fed. Cl. at 729.  With three exceptions, the court found that the requested fees were reasonable and awarded $97,723.41.  *Id.* at 729-30.  As to the exceptions, partner, Kirk R. Ruthenberg billed at $955 per hour, counsel, Charles R. Bruton billed at $740, and senior managing associate, Derek A. Auito billed at $625.  *Id.*  The court found that "FastShip [did] not provide any details that would justify . . . [the] high billing rates" and the court instead awarded them fees in accordance with the 2017 AIPLA Survey—$681 per hour for Mr. Ruthenberg and Mr. Bruton, and $555 for Mr. Auito.  *Id.*  The court therefore awarded $32,759.10 for their combined work.  *Id.* at 730.

Finally, the court evaluated FastShip's requested fees for support staff and paralegals. *FastShip V*, 143 Fed. Cl. at 730.  Because "[t]he [2017] AIPLA Survey d[id] not include information for paralegals and support staff . . . the court [used] the Adjusted Laffey Matrix as a

---

[20] The court also awarded fees for Mr. Carl P. Bretscher.  *FastShip V*, 143 Fed. Cl. at 729. Despite the fact that "the rate charged by Mr. Bretscher is below the AIPLA third quartile number of $681 for a partner," the court awarded fees for Mr. Bretscher at 60 percent of the requested rate "due to the lack of detail on his background," totaling $391,637.70.  *Id.*

starting point" for determining appropriate rates.[21]  *Id.*  While the Laffey Matrix listed the reasonable hourly rate for 2019 at $166, the court determined that "an average rate of $175 [was] appropriate" due to the "technical nature of patent litigation and the experience of the identified and explained support staff."  *Id.* (citation omitted).  In total, support staff billed 2,451.50 hours and the court awarded $429,012.50.  *Id.*  After conducting this analysis and calculations, the court awarded FastShip $5,713,339.60 for attorneys' fees.  *Id.*

In its current motion, FastShip states that it "does not dispute the total awarded or the rationale for the award" in the court's 2019 decision. Pl.'s Mem. at 45.  The government also accepts the prior award amount.  *See* Def.'s Resp. at 37-38; Def.'s Sur-Reply at 19 ("Both parties agree that the Court correctly reduced the attorney and staff fees for the 2018 Requests." (citations omitted)).  At issue is the supplemental requests for attorneys' fees incurred since the prior motion was filed.  *See* Pl.'s Mem. at 45.  In its motion, FastShip requests an additional $634,104.50 for attorneys' fees between March 8, 2019 and October 30, 2020.  Pl.'s Mot. Ex 1. FastShip also requests $138,857.00 for fees incurred between October 30, 2020 and January 24, 2021.[22]  Pl.'s Suppl. Mem. Ex. A.  In total, FastShip requests $772,961.50 for attorneys' fees stemming from the period of March 8, 2019 to January 24, 2021.

The government states that the court should reduce FastShip's hourly rates in accordance with its 2019 opinion, *i.e.*, the court should look to the AIPLA Survey third-quartile hourly rates based on the experience of attorneys and award an hourly rate of $175 for paralegals and support staff.  Def.'s Resp. at 37-38.  While FastShip argues that its "rates are inherently reasonable," it requests that "if the Court decides to reduce the rates in accordance with its past practice[,] . . . that the Court use the 2019 AIPLA Report of the Economic Survey . . . and the 2015-2020 Adjusted Laffey Matrix . . . for awarding fees . . . since these [rates] reflect updated industry rates.  Pl.'s Reply at 20.  The government agrees with the use of these updated surveys.  Def.'s Sur-Reply at 19.

The 2019 AIPLA Survey lists the third-quartile hourly rate in Washington, D.C. for partners at $700 and associates as $516.  Pl.'s Mot. Ex. 3.  The court accepts the use of the 2019 AIPLA Survey and Laffey Matrix and will adopt third-quartile hourly rates for attorneys and an hourly rate of $175 for paralegals and support staff for hours incurred between March 8, 2019 and January 24, 2021.

The largest portion of FastShip's requested attorneys' fees come from Mr. Hogge and Mr. Noronha.  *See* Pl.'s Mot. Ex. 1; Pl.'s Suppl. Mem. Ex. A.  Mr. Hogge billed 336.4 hours at a rate that ranged between $995.00 to $1,080.00, totaling $347,938.00.  Pl.'s Mot. Ex. 1; Pl.'s Suppl. Mem. Ex. A.  Mr. Noronha billed 450 hours at rates that ranged between $770 to $895, totaling $379,679.00.  In accordance with the 2019 AIPLA survey, the court finds that a third-quartile hourly rate of $700 appropriate for Mr. Hogge and a rate of $516 for Mr. Noronha.

---

[21] "The Adjusted Laffey Matrix for 2015-2019 list[ed] the reasonable hourly rates for support staff and paralegals at $154, $157, $164, and $166, respectively." *FastShip V*, 143 Fed. Cl. at 730.

[22] As the court previously stated, *see supra*, FastShip's supplemental memorandum is timely.

While lower than the requested rates, the court believes these rates satisfy the purpose of the statute.  After reductions by fifty percent for fees incurred during the second appeal, the court awards FastShip $191,135.00 in fees for the work of Mr. Hogge and $169,248.00 in fees for the work of Mr. Noronha.[23]

FastShip also requests fees for attorneys, partner Kirk R. Ruthenberg, partner Nicholas H. Jackson, and counsel Kevin R. Greenleaf.  Pl.'s Mot. Ex 1.  Mr. Ruthenberg billed 12.70 hours with an average rate of $1,067.05 for a total of $13,551.50; Mr. Jackson billed 2.00 hours with an average rate of $705.00 for a total of $1,410.00; Mr. Greenleaf billed 15.20 hours with an average rate of $575.00 for a total of $8,740.00.  Pl.'s Mot. Ex. 1; Pl.'s Reply at 18.  The court finds that a $700 hourly rate is reasonable for Mr. Ruthenberg and Mr. Jackson and a $516 hourly rate is reasonable for Mr. Greenleaf.[24]  Therefore, the court awards FastShip $6,545.00 for the work of Mr. Ruthenberg, $700 for the work of Mr. Jackson, and $3,921.60 for the work of Mr. Greenleaf.

For support staff and paralegals, FastShip requests fees for the work of lead legal researcher Mary K. Ciziunas, lead paralegal Cheryl M. Bednarz, lead paralegal Karen H. Johnson, and Hilliard T. Moore, Jr.  Pl.'s Mot. Ex. 1.[25]  Ms. Ciziunas billed 0.60 hours at an hourly rate of $325; Ms. Bednarz billed 39.00 hours at hourly rates ranging from $365 to $400; Ms. Johnson billed 14.90 hours at an hourly rate of ranging from $370 to $390; and Mr. Moore billed 0.50 hours at a rate of $330.00.  Pl.'s Mot Ex. 1; Pl.'s Suppl. Mem. Ex A.[26]  The Adjusted Laffey Matrix for 2015-2020 lists the reasonable hourly rates for support staff and paralegals at $154, $157, $164, $166, and $173, respectively.  Pl.'s Mot. Ex. 2.  An upward adjustment remains appropriate, and the court believes $175 is the reasonable hourly fee for paralegals and support staff.  The court awards FastShip $7,087.50 for the work from support staff and paralegals.

---

[23] Without the reduction for the hours between August 30, 2019 and August 3, 2020, the court would have awarded $235,480.00 in fees for Mr. Hogge and $232,200.00 for Mr. Noronha. However, during the second appeal, Mr. Hogge billed 126.70 hours and Mr. Noronha billed 244 hours.  Pl.'s Mot. Ex. 1.  The court, therefore, reduced the fees awarded by half during that period, a $44,345.00 reduction for Mr. Hogge and a $62,952 reduction for Mr. Noronha.

[24] Mr. Ruthenberg billed 6.7 hours during the second appeal, while all of Mr. Jackson's and Mr. Greenleaf's hours were billed during that time.  Pl.'s Mot. Ex. 1.  Mr. Ruthenberg's fees will be reduced by $2345.00.  Mr. Jackson's and Mr. Greenleaf's fee amounts are reduced accordingly.

[25] FastShip does not provide details about Mr. Moore's background or role in litigation. As the court noted in its 2019 opinion, Mr. Moore was listed as a "Discovery Engineer" in FastShip's initial motion.  *FastShip V*, 143 Fed. Cl. at 730 n.24.

[26] During the second appeal, Mr. Bednarz billed 23.4 hours, Mr. Moore billed 0.50 hours, Mr. Johnson billed 4.5 hours, and Ms. Ciziunas billed 0.60 hours.  The court reduced the awarded fees accordingly.

In total, the court awards FastShip $378,637.10 for attorneys' fees incurred between March 8, 2019 to January 24, 2021.  When combined with the award of $5,713,339.60 for the period before March 8, 2019, FastShip's total award of attorneys' fees is $6,091,976.70.

### B.   *Expert Witness Fees*

"Reasonable and entire compensation . . . includ[es] reasonable fees for expert witnesses."  28 U.S.C. § 1498(a).  Fees for experts are considered to be presumptively reasonable if they were incurred in an arm's length transaction.  *See, e.g., Hitkansut*, 142 Fed. Cl. at 365 (citing *Lost Tree Vill. Corp. v. United States*, 135 Fed. Cl. 92, 96 (2017).  Further, "[f]ees incurred and paid by a client at an agreed rate are presumptively reasonable."  *Florida Rock Indus., Inc. v. United States*, 9 Cl. Ct. 285, 290 (1985).

In its prior opinion, the court discussed FastShip's experts—Dr. Richard Garwin, Dr. Chris McKesson, Ms. Krista Holt, and Mr. Nicholas Edmiston—and the reasonableness of their fees.  *FastShip V*, 143 Fed. Cl. at 730-34.  The court found the fees requested for Dr. Garwin and Dr. McKesson to be reasonable and awarded $196,264.75 for Dr. Garwin and $42,929.94 for Dr. McKesson.  *Id.* at 731.  The court next analyzed the over $1.5 million requested for Ms. Holt and GreatBridge Consulting, who served as damages experts for FastShip.  *See FastShip III*, 131 Fed. Cl. at 623 n.33.  Ultimately, the court found "that the hours and time expended by Ms. Holt and her team are not justified by the work documented or explained," and awarded reduced fees totaling $225,754.00 for Ms. Holt.  *FastShip V*, 143 Fed. Cl. at 733.  Finally, the court denied fees requested for Mr. Edmiston because FastShip failed to provide documentary support for the requested fee, and therefore the court could not tell "if the fees were negotiated at arm's length, if they were reasonable for the work performed, or any other details about the work of Mr. Edmiston."  *Id.* at 734.  In total, the court awarded FastShip $464,948.69 in expert witness fees.  *Id.*

In its present motion, FastShip requests that the court award $464,948.69 for expert fees, including $196,264.75 for Dr. Garwin, $42,929.94 for Dr. McKesson, and $225,725.00 for Ms. Holt.  Pl.'s Mot. at 53-56.  The government states that it "agrees to that amount."  Def.'s Resp. at 38.  The court, therefore, adopts its prior analysis and awards FastShip $464,948.69 for expert fees.

### VI.   *Bill of Costs*

The court must determine what amount of costs can reasonably and appropriately be awarded to FastShip.  *See* 28 U.S.C. §1498(a).  The parties dispute whether FastShip was required to renew its Bill of Costs on remand.  FastShip argues that the Federal Circuit's opinion did not vacate the award of costs because it only stated that the Circuit "vacate[d] the fee award" and did not mention costs.  Pl.'s Bill of Costs at 1 (citing *FastShip VI*, 968 F.3d at 1340).[27]  The government states that FastShip was required to file a renewed Bill of Costs on remand and now "is not entitled to recovery of its litigation costs because it did not timely renew [its] request."  Def.'s Sur-Reply at 4.  As the court stated, FastShip's Bill of Costs was timely filed.  *See supra*.

---

[27] Plaintiff indicates that "it ha[d] already preserved its right to the award of litigation costs" and only filed the present Bill of Costs because the government challenged its ability to recover costs.  Pl.'s Bill of Costs at 1.

Additionally, FastShip was required to file this renewed Bill of Costs.  Section 1498(a) states that "reasonable and entire compensation shall not include such costs and fees if the court finds that the position of the United States was substantially justified."  28 U.S.C. § 1498(a).  Therefore, an award of costs is contingent on the determination of whether the government's conduct was substantially justified.  When the Federal Circuit vacated the court's finding that the government's conduct was not substantially justified and stated that on remand this court "must consider whether the government's litigation conduct alone . . . was not substantially justified," the Circuit necessarily vacated both the award of fees and the award of costs previously granted by this court.  *FastShip VI*, 968 F.3d at 1339.  There can be no award of costs in the absence of a finding that the government's litigation conduct was not substantially justified.

The government's litigation conduct was not substantially justified; thus, an award of costs is appropriate.  *See* 28 U.S.C. § 1498(a).  FastShip seeks $1,229,676.07, the same amount previously granted by this court in its earlier opinion.  Pl.'s Bill of Costs at 12; *see also FastShip V*, 143 Fed. Cl. at 735.  FastShip relies on the arguments advanced in its prior Bill of Costs to support its requested costs.  *See* Pl.'s Bill of Costs at 11.  The parties had previously agreed to $1,229,679.07.  *FastShip V*, 143 Fed. Cl. at 734 ("Both parties agree that $1,096,193.08 of the uncontested costs are recoverable. . . .  And, both parties agree that a further $133,485.99 . . . are reasonable and awardable.").[28]  FastShip does not seek, nor could the court award, costs associated for either appeal.  *Id.* at 735 ("[T]his court has no power to override a decision by the appellate court."); *see also FastShip IV*, 892 F.3d at 1311 ("Each party shall bear its own costs."); *FastShip VI*, 968 F.3d at 1340 ("No costs.").  Therefore, the court awards FastShip $1,229,676.07 in costs.[29]

## CONCLUSION

For the foregoing reasons, plaintiff's motion for attorneys' fees and bill of costs is GRANTED IN PART and DENIED IN PART.  The court awards plaintiff $6,091,976.70 in attorneys' fees, $464,948.69 in expert fees, and $1,229,676.07 in costs.  The Clerk shall enter final judgment for FastShip for a total of $7,786,601.46.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge

---

[28] In the present briefing, the government does not object to this amount, specifically.  Instead the government only challenges FastShip's Bill of Costs as "improper" and "untimely," Def.'s Sur-Reply at 5, an argument that the court already resolved against the government, *see supra*.

[29] The court will not address the government's argument that FastShip's fees and costs award cannot exceed "the apparent value of FastShip's contingent fees[,] . . . $8,032,653.74," Def.'s Sur-Reply at 20, because the total award to FastShip does not exceed the contingent fee number.